**UNITED STATES of America, et al.,**

v.

**Stanley G. SCOTT, et al.**

**No. 3:95cv1216 (AHN).**

United States District Court,
D. Connecticut.

April 2, 1997.

Richard Blumenthal, Hartford, Attorney General, for State of Connecticut.

Christopher Droney, U.S. Attorney, New Haven, Sharon Jaffe, Assistant U.S. Attorney, Bridgeport, Carolyn Ikari and Barbara Bailey Jongbloed, Assistant U.S. Attorneys, New Haven, Jennifer Jaff, Thomas Ring and Alvin Wilson, Assistant Attorneys General, Hartford, for U.S.

Bruce Green, Stephen Crampton and Brian Fahling, Tupelo, MS, for defendants Carmen Vasquez and Bobby Riley.

James Altham, Hamden, CT, for defendant Stanley Scott.

## MEMORANDUM OF DECISION

NEVAS, District Judge.

Plaintiffs United States of America and State of Connecticut bring this action against defendants Stanley G. Scott ("Scott"), Carmen E.F. Vazquez ("Vazquez"), and Bobby J. Riley ("Riley"), alleging violations of the Freedom of Access to Clinic Entrances Act ("FACE"), 18 U.S.C. §§ 248(a)—248(e). The plaintiffs' claim that the defendants have in the past, and will likely again in the future, violate FACE by interfering with access to the Summit Women's Center ("Summit") in Bridgeport, Connecticut, a health clinic that provides reproductive health services. (See Second Am.Compl. ¶ 1.) The plaintiffs seek injunctive relief.

A violation of FACE occurs when a person "by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is ... obtaining or providing reproductive health services." 18 U.S.C. § 248(a)(1). FACE expressly provides that conduct which is protected by the First Amendment does not violate the statute. See 18 U.S.C. § 248(d)(1). Thus, because a remedy for a violation of FACE would necessarily result in a restriction of First Amendment rights, the evidence establishing a violation must be unequivocal.

The issues in this case are whether the defendants violated FACE and, if so, the appropriate remedy. This case is not about whether abortion is right or wrong. Its purpose is not to provide a forum for debate between individuals who are pro-life and those who are pro-choice. It only concerns the application of FACE to the specific facts presented at trial and the court's ruling should in no way be construed as an approving or disapproving commentary on the activities of the abortion demonstrators or the clinic escorts.

The case was tried to the court over nine days in March of 1997. At trial, the plaintiffs and defendants presented twenty-seven and twenty-four witnesses, respectively, and various documentary and videotape evidence. Based on this evidence, the court makes the following findings of fact.

### FINDINGS OF FACT

1. Summit is a state-licensed clinic that provides pregnancy testing and abortion ser-

vices, as well as other gynecological and reproductive health services. (*See* Joint Stipulation Uncontroverted Facts and Statement Contested Issues Fact and Law [hereinafter "Joint Stip."] ¶ 1; 3/3/97 Test. Jeanne Rosen ("Rosen").)

2. Summit also provides birth control counseling and "options" counseling. In options counseling, the counselor discusses the options that are available to women who are pregnant: carrying the pregnancy to term; placing the child for adoption; or terminating the pregnancy. (*See* 3/3/97 Test. Rosen.)

3. Summit is located in a three–story building at 211 Middle Street, in Bridgeport, Connecticut. (*See* App. A; Joint Stip. ¶ 2.)

4. The building in which Summit is located is not set back from the sidewalk. The clinic's only public entrance is directly at the edge of the sidewalk. (*See* 3/3/97 Test. Captain John Donovan ("Donovan"); 3/3/97 Test. Rosen; Pls.' Ex. 41.)

5. The width of the sidewalk outside Summit is approximately thirteen and one–half feet. (*See* Joint Stip. ¶ 4; Pls.' Ex. 41.)

6. The doors to Summit are set back in an entrance way approximately six feet from the edge of the sidewalk. The entrance way is nine feet wide at the point where it meets the sidewalk. It narrows to a width of six feet at the doors into the clinic. (*See* Joint Stip. ¶ 3; Pls.' Ex. 41.)

7. Summit is usually open for business at approximately 7:45 a.m., Tuesday through Saturday. (*See id.* ¶ 5.)

8. Patients coming to Summit by car typically park in one of three parking lots identified as "Parking # 1," "Parking # 2," and "Parking # 3," (the "parking lots") on the map attached to this ruling as Appendix A. (*See* App. A.; 3/3/97 Test. Captain Donovan; 3/3/97 Test. Rosen.)

9. Patients coming to Summit by bus typically exit the bus at one of its stops on Main Street and walk down either Gold Street or Golden Hill Street to reach Middle Street, the street on which Summit is located. (*See* App. A; 3/3/97 Test. Captain Donovan; 3/3/97 Test. Rosen.)

10. Abortions ordinarily are performed at Summit on Tuesdays, Wednesdays, and Saturdays. (*See id.* ¶ 6.)

11. Summit performs both first and second trimester abortions. (*See id.* ¶ 7.)

12. Second trimester abortions routinely involve a two-day process. On the first day a laminaria is inserted in the patient's cervix to stimulate dilation. The patient returns the next day for the abortion procedure. (*See* 3/5/97 Test. Dr. Mary Jane Minkin ("Minkin").)

13. Since it opened in 1975, Summit has been the subject of regular anti-abortion protests. (*See* 3/6/97 Test. Scott.)

14. The largest number of anti-abortion demonstrators at Summit is present on Saturdays. (*See* 3/3/97 Test. Rosen.)

15. Ordinarily, there are between fifteen and forty demonstrators at Summit on Saturdays, between seven and twenty-five demonstrators on Tuesdays, and between one and five demonstrators on Wednesdays. (*See id.*; 3/6/97 Test. Scott.)

16. Anti–abortion activities at Summit consist of demonstrators who pray, carry signs, and walk in circles on the sidewalk in front of the clinic, or congregate on street corners in the immediate vicinity. (*See* 3/4/97 Test. Officer Douglas Woods ("Woods"); 3/12/97 Test. Vazquez.)

17. Demonstrators referred to as "sidewalk counselors" approach clinic patients, their companions, clinic staff and others when they arrive in the vicinity of Summit, and attempt to dissuade them from entering the clinic. (*See* 3/12/97 Test. Vazquez; 3/10/97 Test. Riley.)

18. "Sidewalk counseling" is a designation adopted by the pro-life movement to describe the activities of persons who stand on the public ways near abortion centers and offer pro–life literature, factual information, and personal opinions about abortion to persons who enter the centers. The articulated purpose of such activities is to inform women of the risks and immoral nature of, and the alternatives to, abortion, and to persuade them to seek such alternatives. (*See* 3/12/97 Test. Vazquez; 3/10/97 Test. Riley.)

19. During the period from 1975 through most of 1996, summit contracted with the Bridgeport Police Department to hire off-duty police officers to provide security at the clinic on Tuesdays and Saturdays. (*See* Joint Stip. ¶ 8.)

20. In addition to hiring off-duty Bridgeport police officers, Summit periodically has hired private security guards to provide security at the clinic on Tuesdays and Saturdays. (*See* 3/3/97 Test. Rosen; 3/3/97 Test. Randell Peterson ("Peterson").)

21. At some point between the fall of 1992 and the spring of 1993, students from Wesleyan University in Middletown, Connecticut, as part of a student organization called "Wescort," began to volunteer as escorts at Summit. Shortly thereafter, Patricia Hendrickson ("Hendrickson") organized local citizens into a volunteer group which began escorting at Summit. (*See* 3/6/97 Test. Scott; 3/6/97 Test. Jean–Marc Ellis ("Ellis"); 3/11/97 Test. Hendrickson.)

22. Hendrickson currently directs the escort group at Summit. (*See* 3/11/97 Test. Hendrickson.)

23. Hendrickson gives each escort written instructions which outline the procedures for meeting potential clinic patients approaching Summit. The instructions direct the escort to ask the patients whether they would like to be escorted into the clinic and whether they would like to take the escort's arm. (*See* Pls.' Ex. 17; 3/4/97 Test. Love; 3/3/97 Test. Rhoda Soloway ("Soloway"); 3/4/97 Test. Carol Broadman ("Broadman"); 3/4/97 Test. Corinne Charlap ("Charlap"); 3/4/97 Test. Ann Scheps ("Scheps").)

24. Escorts wear yellow pinafores which have the words "CLINIC ESCORT" prominently displayed in English and Spanish on both the front and back. (*See* Test. Elizabeth Love ("Love").)

25. Escorts provide escort services at Summit every Tuesday and Saturday. (*See id,;* 3/3/97 Test. Rosen.)

26. The escorts' sole purpose is to ensure safe access to and exit from Summit by the clinic's doctors, staff, patients, and people who accompany them.[1] (*See* 3/4/97 Test. Love; 3/3/97; 3/4/97 Test. Charlap; 3/3/97 Test. Soloway; 3/4/97 Test. Scheps.)

27. Although sidewalk counselors attempt to give the clients literature and talk to them about abortion in an effort to persuade them to change their minds about going into Summit, it is the counselors' general practice to "swarm" around any car that parks on the street near Summit or in one of the parking lots nearby, (*see* App. A) because they assume that the occupants intend to go to Summit. (*See* 3/4/7 Test. Officer Frank D'Amore ("D'Amore"); Pls.' Exs. 40, 550.)

28. Officer Woods testified that the sidewalk counselors run at approaching cars in a "bum's rush," trying to convince the occupants not to enter Summit. (*See* 3/4/97 Test. Officer Woods.)

29. Sidewalk counselors also approach patients as they are walking along Main Street, Golden Hill Street, Gold Street and Middle Street (*see* App. A) towards the clinic entrance, and as they are crossing the street from the parking lots. (*See* 3/12/97 Test. Vazquez; 3/7/97 Test. Marilyn Carroll ("Carroll"); 3/6/97 Test. Scott; Pls.' Exs. 55F, 55M, 55R, 55EE.)

30. Escorts, in performing their duties, also walk along Main Street, Golden Hill Street, Gold Street and Middle Street, as well as in the parking lots and the streets and sidewalks adjacent to the parking lots. (*See* App. A; 3/4/97 Test. Love; 3/6/97 Test. Ellis; Pls.' Exs. 55C, 55M.)

31. Patients who are approached by sidewalk counselors often react by crying, pushing them away, or shouting at them: "Get away from me!" (*See* 3/7/97 Test. Officer George Zwally ("Zwally"); 3/4/97 Test. Love; 3/4/97 Test. Broadman; 3/4/97 Test. Officer Erno Nandori ("Nandori"); Pls.' Exs. 55F, 55P, 55HH.)

---

**1.** There was no evidence that the escorts had any contact with Summit clients after they accompanied them to or from the clinic. On the other hand, there was evidence that the sidewalk counselors remained in contact with, and provided support to, women who changed their minds as a result of the counseling.

32. Officer Lawrence Morgan ("Morgan") testified that clients "showed terror in their faces" after being approached by demonstrators. (*See* 3/6/97 Test. Officer Morgan.)

33. Shouting, pushing, blocking and otherwise interfering with a patient's access to Summit can increase the patient's stress level, and thereby increase the risks of a subsequent abortion procedure in the following ways. (*See* 3/5/97 Test. Minkin.)

34. First, if the procedure is being done under local anesthesia, a stressed patient may experience significantly more pain than a patient who is not stressed. The stressed patient may also move around on the table during the procedure which creates a risk that the doctor could puncture the wall of the uterus. (*See id.*)

35. Second, if the procedure is being done under general anesthesia, a stressed patient requires significantly more anesthetic to keep her calm. This increases the risks of complications, such as aspiration of stomach contents. (*See id.*)

36. Finally, stressed patients may have increased post-operative risks. A stressed immune system has more difficulty fighting off infection. (*See id.*)

37. Defendant Scott is a resident of Fairfield, Connecticut. (*See* Joint Stip. ¶ 9.)

38. Scott is "director" of a pro-life group called Voice of the Pre–Born. (*See* 3/6/97 Test. Scott.)

39. Scott also is a member of several national pro-life organizations. He has been on the board of the Connecticut Right to Life Corporation for twenty-two years and is a member of the American Life League. (*See id.*)

40. Scott tries to coordinate the activities of Voice of the Pre–Born as much as possible with the activities and efforts of other groups that protest against abortion. (*See* 3/7/97 Test. Scott.)

41. Specifically, Scott tries to coordinate his efforts with those of an organization called "LAMB" ("Love Abounding from Mother to Baby"). Scott testified that because Voice of the Pre–Born and LAMB share the same philosophy, the two organizations try to help each other as much as possible. Scott attended LAMB meetings and often referred women whom he persuaded to continue their pregnancies to LAMB for assistance with food and diapers. (*See id.;* Dep. Scott, Volume 3 at 33.)

42. On two occasions, Scott has picketed outside the residences of doctors employed by Summit. LAMB organized both of these demonstrations. (*See* 3/6/97 Test. Scott.)

43. Scott has protested at Summit since it opened in 1975. He regularly protests in front of Summit, and along the streets and parking lots in the surrounding area. (*See id.*)

44. When he first started protesting, Scott went to Summit one day a week. He subsequently increased his visits to Summit to fours days a week, but in 1996 he cut back to two days a week. (*See* 3/7/97 Test. Scott.)

45. Scott carries a sign, approximately 2½' × 1½', which contains an enlarged reprint of a July 1993 newspaper article about a woman who died from complications arising from an abortion. (*See* 3/6/97 Test. Scott.)

46. On occasion, Scott has used a sound amplification device (i.e. a power horn) to help him broadcast his message in front of Summit. (*See id.*)

47. Scott does not feel that he must abide by the law regarding abortion because he believes that Supreme Court decisions on abortion violate the Constitution. (*See* 3/7/97 Test. Scott; Pls.' Ex. 55M.)

48. Scott has also described his anti-abortion activities to be part of a "holy war." (*See* 3/6/97 Test. Scott; Dep. Scott, Volume 1 at 196.)

49. On at least six different occasions, Scott has told another pro-life demonstrator that the murder of a doctor who performed abortions was justified. (*See* 3/6/97 Test. Scott; Dep. Scott, Volume 1 at 125.)

50. On March 7, 1995, while standing in front of Summit's entrance, Scott stated, "The doctor should be executed." He was referring to a doctor who was walking into Summit. (*See* Pls.' Ex. 44; 3/4/97 Test. Broadman.)

51. From 1988 through 1996, Scott has been arrested at Summit fourteen times, for, *inter alia,* breach of peace, disorderly conduct, assault 3rd, harassment 1st, threatening, and obstructing free passage. (*See* 3/3/97 Test. Captain Donovan; Pls.' Exs. 19–32.)

52. On September 21, 1996, Scott wrote in his daily journal, "I suspect [Summit] is not sending clients for abortions through the lobby anymore as a precaution against us or myself changing the client's mind as she is walking through. So unquestionably if this is true, then it will be more difficult to change her mind and we will have to use more aggressive methods." (*See* 3/7/97 Test. Scott; Pls.' Ex. 33A.)

53. Scott regularly obstructs free ingress to, and egress from, Summit by stepping in front of escorts; using his sign to prevent escorts from walking past him; positioning himself next to patients' automobiles so that they have difficulty opening their car doors; and following patients to and from the Summit entrance after they have indicated to him, often in very strong language, that they do not want to talk with him. (*See* 3/6/97 Test. Anne Fogel ("Fogel"); 3/6/97 Test. Ellis; 3/3/97 Test. Peterson; 3/4/97 Test. Broadman; 3/7/97 Test. Joann Davidson ("Davidson"); Pls.' Exs. 55A, 55F, 55L, 55M, 55N.)

54. Lynda Bluestein ("Bluestein") testified that Scott "pushes me into walls, doorways, using his whole body." (*See* 3/6/97 Test. Bluestein.)

55. Bluestein, Soloway and Davidson, who are all escorts, testified that Scott has used his sign as a "battering ram" to block them from walking with clients. (*See id.;* 3/3/97 Test. Soloway; 3/7/97 Test. Davidson; Pls.' Ex. 47.)

56. Officer Zwally testified that he had warned Scott for ramming into escorts with his sign. (*See* 3/7/97 Test. Officer Zwally.)

57. Scott walks very close (within one or two feet) to patients seeking to enter or leave Summit, and constantly shouts at them in a very loud voice. (*See id.;* Pls.' Exs. 55I, 55M.)

58. Standing directly in front of Summit's entrance, Scott regularly shouts statements such as "you will have your organs ripped out," "you can die in there," "you've had your dirty sex and now you have to pay for it," "you may never be a mother again," and "they had to rush a woman out of here in an ambulance bleeding to death—it can happen to you today." (*See* 3/6/97 Test. Scott; Pls.' Exs. 55A, 55M.)

59. Scott yells so loudly that he can be heard inside the building on the second floor. (*See* 3/3/97 Test. Rosen; 3/4/97 Test. Scheps; 3/6/97 Test. Fogel; Pls.' Exs. 55A, 55I.)

60. Officer Joseph A. Hernandez ("Hernandez"), a witness called by defendants Vazquez and Riley, stated that Scott "has the loudest set of pipes I've ever heard." (3/7/97 Test. Officer Hernandez.)

61. Officer Woods testified that he could hear Scott yelling when he went to the second floor of Summit to use the telephone or bathroom. Officer Woods further stated that by continuously yelling at the top of his lungs, Scott's behavior regularly verged on disorderly conduct. (*See* 3/4/97 Test. Officer Woods; Pls.' Ex. 55I.)

62. Officer Zwally called Scott "boisterous" and "pushy," and testified that he had to warn Scott constantly about yelling at Summit's doors and yelling up to the waiting room on the second floor. (*See* 3/7/97 Test. Officer Zwally; Pls.' Ex. 55I.)

63. Bluestein testified that "Scott is always screaming, continually—screaming at clients, running across the street to parked cars, following [clients] and screaming until they get to the door—then screaming at the closed clinic door." (*See* 3/6/97 Test. Bluestein; Pls.' Exs. 55I, 55M.)

64. Summit patients and their companions react to Scott's activities in various ways; many become upset and angry. (*See* Pls.' Ex. 55F.)

65. At times, police have intervened in heated exchanges between Scott and male companions of patients outside Summit in order to prevent violence. (*See* 3/7/97 Test. Scott; Pls. Ex. 55J.)

66. On one occasion, Officer Nandori prevented a fight between a male companion and Scott when Scott refused to stop berating a couple after they informed him that their pregnancy was ectopic.[2] (*See* 3/4/97 Test. Officer Nandori.)

67. Scott testified that, on another occasion, in response to Scott's pleas that a man reconsider the decision to abort his baby, the man "started to come at me[.] [The security guard] held him back, [but] then he started to go into his belt as if to draw out a gun. And he said while doing that, I'll blow his head off." (3/6/97 Test. Scott; Pls.' Ex. 33.)

68. Scott also testified that patients and their male companions have hit him, slapped him, and even MACE'd him in response to his attempts to persuade them against abortion. (*See* 3/6/97 Test. Scott.)

69. On as many as twenty occasions, Bridgeport police officers have restrained Scott and warned him not to block patients' passage while they are walking to the clinic. (*See id.*; 3/4/97 Test. Officer Thomas Choothesa ("Choothesa"); 3/4/97 Test. Officer Woods; 3/4/97 Test. Officer Nandori.)

70. On forty or fifty occasions, Bridgeport police officers have warned Scott not to stand in front of the entrance to Summit. (*See* 3/6/97 Test. Scott; 3/7/97 Test. Officer Zwally; 3/4/97 Test. Officer Choothesa; Pls.' Ex. 55F.)

71. On approximately thirty occasions, Bridgeport police officers have warned Scott about the volume of his voice. (*See* 3/6/97 Test. Scott; 3/4/97 Test. Officer Woods; 3/10/97 Test. Officer Gilberto Valentin ("Valentin"); 3/7/97 Test. Officer Zwally.)

72. Scott frequently runs towards patients trying to enter or leave Summit. He also runs towards patients who run away from him in an attempt to avoid him. (*See* 3/6/97 Test. Scott; Ps.' Ex. 55M.)

73. Scott often persists in talking with a patient entering or leaving Summit after that patient has indicated that she wants him to leave her alone. (*See* Pls.' Exs. 55F, 55H.)

74. Scott was present outside Summit on December 3, 1994; January 14, 1995; February 18, 1995; February 21, 1995; February 25, 1995; March 14, 1995; April 8, 1995; April 18, 1995; June 6, 1995; June 24, 1995; July 11, 1995; July 25, 1995; October 16, 1995; December 2, 1995; December 23, 1995; April 13, 1996; and many other dates between 1994–1997. (*See* Joint Stip. ¶ 12.)

75. In July or August of 1994, Scott pushed escort Scheps from behind as she was standing beside a patient's car. (*See* 3/4/97 Test. Scheps.)

76. On or about December 3, 1994, Scott stated to Rosen, the administrator of Summit, "You're young. But just because you are young does not mean your life won't be taken early." This was not Scott's "routine rhetoric" and Rosen believed that Scott was threatening her. (*See* 3/3/97 Test. Rosen; Pls.' Ex. 49.)

77. Rosen testified that she was so frightened by Scott's statement that she applied for a gun permit and took lessons on the use of a gun. (*See* 3/3/97 Test. Rosen.)

78. On or about January 14, 1995, Scott pushed escort Fogel as she was escorting a Summit patient. (*See* 3/6/97 Test. Fogel.)

79. On or about February 18, 1995, Scott pushed two Wesleyan students as they were escorting a Summit patient to the bus stop. (*See* 3/6/97 Test. Scott; Dep. Scott, Volume 4, at 61; 3/6/97 Test. Ellis.)

80. On or about February 18, 1995, Scott pushed escort Bluestein as she was assisting a Summit patient. (*See* 3/6/97 Test. Lynda Bluestein; Pls.' Ex. 37.)

81. On or about February 21, 1995, Scott pushed Summit's private security guard as he was attempting to assist a patient. (*See* 3/3/97 Test. Peterson; 3/3/97—3/4/97 Test. Love; Pls.' Exs. 38, 42.)

82. On or about February 21, 1995, and again on February 25, 1995, Scott obstructed Summit patients who were trying to get out of their cars. (*See* 3/3/97 Test. Peterson;

---

**2.** An ectopic pregnancy is "a pregnancy that develops outside the uterus, most commonly in the fallopian tube.... Ectopic pregnancies are life threatening and are responsible for about 10 percent of maternal deaths." The American Medical Association Encyclopedia of Medicine 389 (Charles B. Clayman, M.D. ed., Random House 1989). (*See also* 3/5/97 Test. Minkin.)

3/3/97—3/4/97 Test. Love; Pls.' Exs. 38, 39, 40.)

83. On or about February 21, 1995, Scott said to Summit's private security guard, "[a] bullet could come your way today." (*See* 3/3/97 Test. Peterson; Pls.' Ex. 38.)

84. On or about March 14, 1995, Scott pushed escort Barbara Arnn as she was escorting a patient. (*See* Pls.' Ex. 58 at 66–69.)

85. On or about April 8, 1995, Scott pushed Maria G. Melendez ("Melendez"), a nursing assistant at Summit, as she was escorting a patient. Melendez had been walking from her car to Summit when she offered to escort a patient into the building because Scott had been preventing her from getting out of her car. (*See* 3/5/97 Test. Melendez; Pls.' Ex. 50.)

86. On or about June 6, 1995, Scott pushed escort Broadman as she was escorting a patient. (*See* 3/4/97 Test. Broadman; Pls.' Exs. 44, 55L.)

87. On or about June 24, 1995, Scott pushed escort Charlap as she was escorting a patient. (*See* 3/4/97 Test. Charlap; Pls.' Exs. 45, 55A.)

88. On or about July 11, 1995, Scott kicked escort Davidson as she was escorting a patient. (*See* 3/7/97 Test. Davidson; Pls.' Ex. 46.)

89. On or about October 16, 1995, Scott bumped escort Davidson as she was escorting patients. (*See* 3/7/97 Test. Davidson; Pls.' Ex. 47.)

90. On or about October 17, 1995, Scott pushed an escort, who walks with a limp, while she was escorting a patient to the clinic. (*See* Pls.' Ex. 55N.)

91. On or about December 23, 1995, Scott pushed escort Max Harris at Summit as he was escorting a patient. (*See* Pls.' Ex. 55D.)

92. On or about April 13, 1996, Scott pushed escorts Bluestein and Norman Harris as they were escorting patients. (*See* 3/6/97 Test. Bluestein; 3/6/97 Test. Officer Morgan; Pls.' Ex. 32.)

93. On the dates set forth above, as well as on numerous dates unknown, Scott has engaged in a persistent and consistent pattern of pushing, shoving, bumping, physically obstructing and threatening persons seeking to enter and exit Summit, in order to intimidate and interfere with, or attempt to intimidate or interfere with, those persons because they sought to enter and exit Summit for the purpose of obtaining or providing reproductive health services.

94. Defendant Vazquez is a resident of West Haven, Connecticut. (*See* Joint Stip. ¶ 10.)

95. Vazquez has been going to Summit to pray, protest and counsel for approximately seven years. For the last three and one-half years, she has been going to Summit on Tuesdays. (*See* 3/12/97 Test. Vazquez.)

96. Vazquez is a member of LAMB. Through LAMB, she provides continuing assistance to women who have been persuaded not to have abortions. Along with other members of LAMB, she visits these women in the hospital after child birth and thereafter provides them with food, clothing, diapers, baby furniture, and other practical needs. (*See id.;* 3/7/97 Test. Carroll.)

97. Vazquez, along with others, including Carroll, founded LAMB in 1990. (*See* 3/7/97 Test. Carroll.)

98. LAMB is an outreach group of the Living Word Ministries Church in West Haven, Connecticut. (*See* 3/10/97 Test. Riley.)

99. The church has approximately 1600 members, including children. (*See id.*)

100. Over the seven years that LAMB has been in existence, its members have persuaded some women to continue their pregnancies. (*See* 3/7/97 Test. Carroll; 3/12/97 Test. Vazquez; 3/7/97 Test. Toniann Murzin ("Murzin"); 3/7/97 Test. Sally Rodriguez; 3/10/97 Test. Yvette Chiesa ("Chiesa"); 3/10/97 Test. Lita Cooley ("Cooley"); 3/11/97 Test. Janick Cruz.)

101. Some of the women who were persuaded to continue their pregnancies subsequently joined LAMB and the Living Word Ministries church. (*See* 3/7/97 Test. Murzin; 3/10/97 Test. Chiesa; 3/10/97 Test. Cooley.)

102. Vazquez's pro-life activities are religiously motivated and her intent in sidewalk counseling and leafletting is to persuade

women to consider alternatives to abortion and to share her Christian faith. (*See* 3/12/97 Test. Vazquez; 3/11/97 Test. Hendrickson; 3/4/97 Test. Love.)

103. All of the complaints of obstruction and interference that form the basis of this case against Vazquez were made by escorts, not patients. (*See* 3/4/97 Test. Love.)

104. Hendrickson, director of the escort group, actively participated in the preparation of the plaintiffs' case. In January of 1995, after the attack on an abortion clinic in Brookline, Massachusetts, Hendrickson directed the escorts to write down all FACE violations that they witnessed at Summit. (*See id.;* 3/4/97 Test. Broadman.)

105. In her testimony before the Judiciary Committee of the Connecticut General Assembly, Hendrickson made no mention of Vazquez's activities at the clinic. Hendrickson also did not mention Vazquez's activities in her February 3, 1995 meeting with FBI agent Lisa Skelly. (*See* 3/11/97 Test. Hendrickson; Defs.' Ex. YP.)

106. While Hendrickson diligently recorded, in writing, all of her complaints against Scott, she did not write down any complaints against Vazquez. (*See* 3/11/97 Test. Hendrickson.)

107. Further, while the escorts were instructed to make a written record of all complaints against demonstrators outside Summit, and did so on numerous occasions with respect to Scott, no escort made a written complaint against Vazquez. (*See* 3/11/97 Test. Hendrickson; Defs.' Ex. ttt.)

108. Several police officers who were present at Summit on various dates, testified that escorts regularly complained to them about pushing, shoving, obstructing, and interfering by demonstrators. (*See* 3/4/97 Test. Officer D'Amore; 3/4/97 Test. Officer Choothesa; 3/4/97 Test. Officer Nandori; 3/7/97 Test. Officer Zwally; 3/7/97 Test. Officer Olivia Bell ("Bell"); 3/7/97 Test. Officer Hernandez; 3/10/97 Officer Valentin; 3/4/97 Test. Officer Woods.)

109. Three officers testified that they observed the particular incidents of which the escorts complained and found the conduct of the demonstrators to be lawful. On occasion, the officers found that the escorts exaggerated the conduct of the demonstrators in an apparent attempt to create evidence of a violation of the law when none existed. (*See* 3/7/97 Test. Officer Hernandez; 3/10/97 Officer Valentin; 3/4/97 Test. Officer Woods.)

110. On occasion, the escorts, in attempting to walk next to patients, prevented sidewalk counselors from speaking with, or handing literature to, the patients. They also sometimes tried to drown out the counselors' message by clapping their hands or yelling, "Blah, Blah, Blah, Blah." (*See* 3/7/97 Test. Davidson; Defs.' Ex. WF.) [3]

111. The police officers who were routinely stationed within conversational distance of Vazquez, testified that when they investigated complaints about her conduct, they found the complaints to be baseless. (*See* 3/7/97 Test. Officer Hernandez; 3/10/97 Officer Valentin; 3/4/97 Test. Officer Woods.)

112. Officer Nandori testified that he found Vazquez to be "quite lady–like" and that he never saw her obstruct or block anyone's path. (*See* 3/4/97 Test. Officer Nandori.)

113. Officer Bell described Vazquez as "soft spoken and polite" and stated that she never had to warn Vazquez about improper behavior at Summit. (*See* 3/7/97 Test. Officer Bell.)

114. Officer Woods also stated that he never saw Vazquez physically touch or obstruct an escort or patient. (*See* 3/4/97 Test. Officer Woods.)

115. Officer D'Amore, a witness called by the plaintiffs, admitted that he never had to warn Vazquez and that when she is standing outside a patient's car, she moves out of the way to let the patient open the door and get out. (*See* 3/4/97 Test. Officer D'Amore.)

---

**3.** This court notes, as the district court did in *Pro–Choice Network of W.N.Y. v. Project Rescue W. New York,* that "[w]hile the court can understand the frustration of the escorts, the evidence adduced at [trial] . . . shows that [on occasion] their behavior . . . serve[d] only to exacerbate an already difficult situation." *Pro–Choice Network,* 799 F.Supp. 1417, 1425 n. (W.D.N.Y.1992).

116. Vazquez was present outside Summit on April 4, 1995 and May 23, 1995. (*See* Joint Stip. ¶ 13.)

117. After repeatedly and carefully viewing exhibit 55P and reviewing Vazquez's testimony, the court finds that Vazquez did not obstruct a client as she was approaching the clinic on April 4, 1995. (*See* 3/12/97 Test. Vazquez; Pls.' Ex. 55P.)

118. After repeatedly and carefully viewing exhibit 55O and reviewing both the testimony of escort Love and Vazquez, the court finds that Vazquez did not obstruct a client from getting out of a taxi on May 23, 1995. Any obstruction of the car door was caused by the presence of numerous individuals who crowded the curbside. Vazquez was not the first person to approach the taxi. (*See* 3/12/97 Test. Vazquez; Pls.' Ex. 55O; *but see* 3/4/97 Test. Love.)

119. After viewing all videotape exhibits submitted by the plaintiffs and reviewing the testimony of all of the plaintiffs' witnesses and the defendants' witnesses, the court finds that Vazquez did not engage in a pattern of obstructive conduct in violation of FACE.

120. According to the video evidence and oral testimony, Vazquez never stopped the forward progress of an individual seeking reproductive services at Summit.

121. The testimony of the plaintiffs' witnesses indicated that Vazquez extended her arm to offer literature to clients, and on occasion her arm passed in front of an escort who was walking alongside the client. At other times, Vazquez passed in front of escorts and clients in an attempt to walk next to the client and offer literature. (*See e.g.,* Pls.' Ex. 55P.)

122. The court finds that the evidence does not support a finding that Vazquez intended to interfere with, intimidate or render passage unreasonably difficult or hazardous for patients and escorts attempting to enter or leave Summit. Vazquez's stated intent was to exercise her First Amendment right to give pro-life literature to patients entering the clinic and to persuade them to pursue alternatives to abortion. (*See* 3/12/97 Test. Vazquez.)

123. Defendant Riley is a resident of Bridgeport, Connecticut. (*See* Joint Stip. ¶ 11.)

124. Riley has known Vazquez for thirteen or fourteen years. They met through the Living Word Ministries Church. Riley is also a member of LAMB. (*See* 3/10/97 Test. Riley.)

125. Riley is an Elder in the Living Word Ministries Church, and through that position he oversees the operations of LAMB. (*See id.*)

126. Riley has been a sidewalk counselor at Summit for five and one-half years. He almost always goes to Summit on Saturdays. (*See id.*)

127. Unlike the plaintiffs' allegations that Scott and Vazquez engaged in a pattern of obstructive behavior, they allege only one FACE violation against Riley. (*See* Second Am. Compl. ¶¶ 23–25.)

128. The Second Amended Complaint alleges that on January 3, 1995, Riley stated to Summit employee Milagros Luna ("Luna"), "95, you're next." (*See* Second Am. Compl. ¶ 23(b).) The plaintiffs allege that Riley was referring to the Brookline, Massachusetts abortion clinic attack that had occurred two weeks earlier which resulted in two murders, and that, by making such a reference, he threatened Luna's life.

129. There is no written report by a police officer or security guard concerning Luna's allegation of Riley's statement.

130. Riley was present outside Summit on January 3, 1995. (*See* Joint Stip. ¶ 14.)

131. It was Riley's custom and practice to tell Summit staff who were walking into the clinic that he was praying they would find a different job. (*See* 3/11/97 Test. Christine Zimmerman ("Zimmerman"); 3/10/97 Test. John Reyes ("Reyes"); 3/10/97 Test. Riley; 3/7/97 Test. Carroll.)

132. Riley testified that on January 3, 1995, he said to Luna, "I'm praying that in 1995, this will be the last year that you would work here." (3/10/97 Test. Riley.)

133. Zimmerman, another sidewalk counselor, was walking with Riley on January 3,

1995, and testified that she heard him tell Luna that he was praying that she would find a better job next year. (*See* 3/11/97 Test. Zimmerman.)

134. Riley had spoken to Luna on previous occasions, always telling her that he was praying that she would find another job. (*See* 3/10/97 Test. Riley.)

135. Riley did not speak to Luna after January 3, 1995. He stated that her reaction to him on that date made him feel that he should no longer interact with her. (*See id.*)

136. There is a conflict in the testimony regarding Luna's possession of a gun. Luna stated that Riley's statement frightened her so much that she applied for and received a gun permit and was planning to purchase a gun. (*See* 3/5/97 Test. Luna.) However, Humberto Pinheiro ("Pinheiro"), another Summit employee, testified that on January 3, 1995, after Luna told him that Riley had just threatened her, she showed him a gun that she was carrying. Pinheiro testified that, after seeing the gun, he was so concerned for Riley's safety that he went outside and warned Riley to be careful because Luna had a gun. (*See* 3/5/97 Test. Pinheiro; 3/10/97 Test. Riley.)

137. The allegation that, on or about January 3, 1995, Riley uttered the words "95, you are next" to Luna has not been proven by a preponderance of the evidence.

138. Alternatively, even if the court found that Riley stated to Luna, "95, you are next," the statement was made more than two years ago. Riley has not spoken to Luna since that date and Luna no longer works at Summit. (*See* 3/10/97 Test. Riley; 3/5/97 Test. Luna.)

139. There is no imminent danger that Riley will commit any acts of physical force or violence against Luna or that Riley will make any threatening statements to other Summit employees.

## CONCLUSIONS OF LAW

### A. The Provisions of FACE

1. The court has jurisdiction over this action under 18 U.S.C. § 248(c)(2) and (3), and 28 U.S.C. § 1345.

2. FACE provides criminal penalties and civil remedies for anyone who "by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to interfere with any person because that person is or has been, or in order to intimidate such person or any person or any class of persons from, obtaining or providing reproductive health services...." 18 U.S.C. § 248(a)(1).

3. A civil action for violation of FACE can be brought either by the person aggrieved by the conduct prohibited by FACE, the United States Attorney General, or the Attorney General of any state in *parens patriae* "on behalf of natural persons residing in such State...." 18 U.S.C. § 248(c).

4. FACE protects escorts who are assisting patients and staff in obtaining access to the clinic. *See* S.Rep. No. 103–117, at 26 ("[p]ersons injured in the course of assisting patients or staff in gaining access to a facility, or injured bystanders, may also sue if they can establish that the conduct causing the injury was undertaken with the requisite motive—in order to intimidate some person or class of persons from obtaining or providing abortion-related services"); *United States v. Hill*, 893 F.Supp. 1034, 1038–39 (N.D.Fla.1994) (holding that physician's escort was a "provider" covered by FACE)

5. The term "interfere with" is defined in FACE as "to restrict a persons' freedom of movement." 18 U.S.C. § 248(e)(2).

6. The word "intimidate" is defined in FACE as "to place a person in reasonable apprehension of bodily harm to him or herself or to another." 18 U.S.C. § 248(e)(3).

7. Prohibited "threats of force" violative of FACE include genuine threats of harm intended to injure, intimidate, or interfere with someone because that person is obtaining or providing abortion-related services, where it is reasonably foreseeable that the threat would be interpreted as a serious expression of an intention to inflict bodily harm. *See* S.Rep. No. 103–117, at 23. *See also Cheffer v. Reno*, 55 F.3d 1517, 1521 (11th Cir.1995) (stating that a "threat" is a threat of physical force placing a person in reasonable apprehension of bodily harm); *United*

*States v. Brock,* 863 F.Supp. 851, 857 n. 7 (E.D.Wis.1994) (stating that "reasonable apprehension" language limits "threats" to "true threats" as opposed to protected speech), *aff'd sub nom. United States v. Soderna,* 82 F.3d 1370 (7th Cir.), *cert. denied sub nom. Hatch v. United States,* — U.S. —, 117 S.Ct. 507, 136 L.Ed.2d 398 (1996).

■ 8. The court, in analyzing a threat, must distinguish between "true threats" and protected speech. See *United States v. Dinwiddie,* 76 F.3d 913, 925 (8th Cir.), *cert. denied* — U.S. —, 117 S.Ct. 613, 136 L.Ed.2d 538 (1996).

■ 9. A "true threat" is more than hyperbole, and is taken "'against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open....'" *Watts v. United States,* 394 U.S. 705, 708, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969) (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964)).

■ 10. "The court must analyze the alleged threat in light of its entire factual context, and decide whether the recipient of the alleged threat could reasonably conclude that it expresses a determination or intent to injure presently or in the future." *Dinwiddie,* 76 F.3d at 925 (citations and internal quotation marks omitted). *See also United States v. Gilbert,* 884 F.2d 454, 457 (9th Cir.1989) (stating that threat should be considered in light of entire factual context, including surrounding events and reaction of listeners), *cert. denied,* 493 U.S. 1082, 110 S.Ct. 1140, 107 L.Ed.2d 1044 (1990); *United States v. Hoffman,* 806 F.2d 703, 707 (7th Cir.1986) (holding that "true threat" is one made in context wherein reasonable person would foresee that it would be interpreted by recipient as expression of intent to inflict harm), *cert. denied,* 481 U.S. 1005, 107 S.Ct. 1627, 95 L.Ed.2d 201 (1987).

11. The term "physical obstruction" is defined in FACE as "rendering impassable ingress to or egress from a facility that provides reproductive health services ... or rendering passage to or from such a facility

... unreasonably difficult or hazardous." 18 U.S.C. § 248(e)(4).

B. *Constitutionality of FACE under the First Amendment*

■ 12. FACE is constitutional under the First Amendment. *See Soderna,* 82 F.3d 1370 (7th Cir.1996); *Dinwiddie,* 76 F.3d 913 (8th Cir.1996); *Cheffer,* 55 F.3d 1517 (11th Cir.1995); *American Life League Inc. v. Reno,* 47 F.3d 642 (4th Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 55, 133 L.Ed.2d 19 (1995); *United States v. White,* 893 F.Supp. 1423 (C.D.Cal.1995); *Riely v. Reno,* 860 F.Supp. 693 (D.Ariz.1994); *Cook v. Reno,* 859 F.Supp. 1008 (W.D.La.1994), *rev'd on other grounds,* 74 F.3d 97 (5th Cir.1996); *Council for Life Coalition v. Reno,* 856 F.Supp. 1422 (S.D.Cal.1994).

■ 13. Physical obstruction and the use of force and threats of force are not protected by the First Amendment. *See Dinwiddie,* 76 F.3d at 922 (citing *Wisconsin v. Mitchell,* 508 U.S. 476, 484–85, 113 S.Ct. 2194, 2198–99, 124 L.Ed.2d 436 (1993) (holding that "a physical assault is not by any stretch of the imagination expressive conduct protected by the First Amendment")); *Cameron v. Johnson,* 390 U.S. 611, 615–17, 88 S.Ct. 1335, 1337–39, 20 L.Ed.2d 182 (1968) (rejecting First Amendment challenge to law that prohibits obstructing access to courthouse); *Soderna,* 82 F.3d at 1375 (holding that "the [First] [A]mendment does not extend its protection to [the situation] where the picketer physically impedes entry to the picketed premises"); *American Life League,* 47 F.3d at 648 (holding that "the use of force or violence is outside the scope of First Amendment protection"); *White,* 893 F.Supp. at 1435 (same); *Council for Life Coalition,* 856 F.Supp. at 1426 (same); *Riely,* 860 F.Supp. at 701 (same)

■ 14. The fact that FACE prohibits force, threats of force and physical obstruction *only* when such acts are intended to interfere with the right to obtain or provide reproductive health services, does not render it content–based. *See Dinwiddie,* 76 F.3d at 922; *Soderna,* 82 F.3d at 1376; *American Life League,* 47 F.3d at 650; *White,* 893

F.Supp. at 1436; *Council for Life Coalition,* 856 F.Supp. at 1427.

15. Conduct may be regulated even if it disproportionately impacts those who hold a certain viewpoint as long as it is not regulated *because* of that viewpoint. *See Dinwiddie,* 76 F.3d at 923; *Madsen v. Women's Health Center,* 512 U.S. 753, 763–65, 114 S.Ct. 2516, 2524, 129 L.Ed.2d 593 (1994); *Mitchell,* 508 U.S. at 488, 113 S.Ct. at 2201. *See also United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (upholding statute prohibiting destruction of draft cards despite fact that most offenders were opposed to the Vietnam war).

16. A content–neutral statute which potentially regulates conduct that has protected expressive elements protected by the First Amendment is subject to intermediate scrutiny. *See American Life League,* 47 F.3d at 651.

17. The intermediate test of validity pursuant to the First Amendment requires 1) the statute to serve an important or substantial governmental interest; 2) the governmental interest to be unrelated to the suppression of free expression; and 3) that any incidental restriction on alleged First Amendment freedoms be no greater than is essential to further the governmental interest. *See American Life League,* 47 F.3d at 651 (citing and quoting *O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679).

18. Alternatively, the intermediate test of validity pursuant to the First Amendment asks: (1) whether the statute is narrowly tailored to serve a significant governmental interest; and (2) whether the statute leaves open ample alternative channels for communication. *See Brock,* 863 F.Supp. at 865 (citation omitted).

19. The governmental interests in protecting the public's access to health care, as well as in public safety and order, in promoting the free flow of traffic on public streets and sidewalks, and in medical privacy, are significant. *See Madsen,* 512 U.S. at 767–68, 114 S.Ct. at 2526.

20. The fact that FACE prohibits only unprotected conduct, i.e., force, threats of force and physical obstruction, and not peaceful protest, and the fact that the statute leaves open ample alternative methods of communication, satisfies the requirement that it "proscribe[ ] no more expressive conduct than necessary to protect safe and reliable access to reproductive health services." *American Life League,* 47 F.3d at 652.

21. "Protesters may still stand outside reproductive health facilities and express their anti-abortion message [and] they may still proclaim their views and make their pleas by voice, signs, handbills, symbolic gestures and other means," so long as they do it in a "non–violent, non–obstructive manner." *Id.*

## C. *Defendant Scott's Violations of FACE*

22. On numerous occasions, Scott has violated FACE by the use of force to intentionally injure, intimidate or interfere with, or attempt to injure, intimidate or interfere with, volunteer escorts and Summit staff because they were assisting patients seeking to obtain reproductive health services. The plaintiffs presented extensive evidence, both through the testimony of escorts, Summit employees, and police officers, and through videotape and documentary exhibits, of Scott's repeated physical contact with escorts and Summit employees. After carefully reviewing this evidence, the court concludes that Scott, while protesting at Summit, repeatedly crossed the line from protected First Amendment activity to unprotected physical contact. For example, plaintiffs' exhibit 55L shows Scott knocking over escort Broadman in an attempt to counsel a patient entering Summit. After knocking Broadman down, Scott said, "That's what happens when you get in my way!" (*See* Pls.' Ex. 55L; 3/4/97 Test. Broadman.) This sort of conduct does not constitute the type of peaceful protesting or leafleting that is protected by the First Amendment.

23. Scott has also violated FACE on numerous occasions by using physical obstruction to intentionally injure, intimidate or interfere with, or attempt to injure, intimidate or interfere with, Summit patients, escorts, and staff because they were obtaining or

providing reproductive health services. Again, after an extensive review of the testimony and videotape and documentary exhibits submitted by the plaintiffs, the court concludes that Scott repeatedly rendered passage unreasonably difficult for clinic escorts, staff and patients. Scott did not simply attempt to hand literature to patients. He followed them to and from the clinic, and yelled phrases at them such as "You've had your dirty sex, and now you have to pay for it." (*See* 3/6/97 Test. Scott.) He often stood so close to cars that patients were unable to open their car doors, and even after he allowed them to exit, he would stand within one foot of them, forcing them to maneuver around him to get to the clinic. (*See* Pls.' Exs. 40, 55M.) Scott can exercise his First Amendment rights by protesting abortion and counseling clinic patients without obstructing access to the facility.

24. Finally, Scott has violated FACE on at least two occasions by using threat of force to intentionally injure, intimidate or interfere with Summit staff because they were providing reproductive health services. The court heard evidence of two specific threats made by Scott to Rosen and Peterson. (*See* 3/3/97 Test. Rosen; 3/3/97 Test. Peterson.) Based on Scott's statements to another protester that the murder of a doctor who performs abortions was justified, (*see* Dep. Scott, Volume 1 at 125) and his statement, "the doctor should be executed," which was witnessed by Broadman while she was escorting patients at Summit, (*see* 3/4/97 Test. Broadman) the court finds that the threats to Rosen and Peterson should be taken seriously.

D. *Defendant Vazquez's Violations of FACE*

25. FACE expressly disavows the creation of new remedies for interference with activities protected by the Free Speech or Free Exercise Clauses of the First Amendment to the United States Constitution, occurring outside abortion facilities, regardless of the point of view expressed, or to limit any existing legal remedies for such interference. 18 U.S.C. § 248(d)(2).

26. "Leafleting and commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment, and speech in public areas is at its most protected on public sidewalks, a prototypical example of a traditional public forum." *Schenck v. Pro–Choice Network of W. N.Y.,* —— U.S. ——, ——, 117 S.Ct. 855, 858, 137 L.Ed.2d 1 (1997). *See also Boos v. Barry,* 485 U.S. 312, 322, 108 S.Ct. 1157, 1164, 99 L.Ed.2d 333 (1988); *United States v. Grace,* 461 U.S. 171, 180, 103 S.Ct. 1702, 1708, 75 L.Ed.2d 736 (1983).

27. Whether an individual's speech offends some persons does not lessen its constitutionally protected status. "[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection.'" *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 55, 108 S.Ct. 876, 882, 99 L.Ed.2d 41 (1988) (quoting *FCC v. Pacifica Found.,* 438 U.S. 726, 745, 98 S.Ct. 3026, 3038, 57 L.Ed.2d 1073 (1978)). *See also Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.,* 502 U.S. 105, 118, 112 S.Ct. 501, 509, 116 L.Ed.2d 476 (1991); *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 910, 102 S.Ct. 3409, 3424, 73 L.Ed.2d 1215 (1982); *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720–21, 11 L.Ed.2d 686 (1964).

28. Vazquez's conduct constitutes protected First Amendment activity and does not rise to the level of "physical obstruction" necessary to establish a FACE violation.

29. Plaintiffs' exhibit 55P depicts the April 4, 1995 violation alleged in the Second Amended Complaint. (*See* Second Am. Compl. ¶ 19(d) (alleging "On or about April 4, 1995, defendant Vazquez obstructed a client as she was approaching the clinic.").) At most, this exhibit shows that the client changed direction when Vazquez crossed in front of her as they both crossed Middle street toward Summit. It appears to the court that Vazquez was actually trying to get out of the client's path so that she could walk beside her and offer her literature. By the time the client stepped onto the sidewalk at

the corner of Middle and Gold Streets, Vazquez was already trailing behind her and the escorts. Vazquez's actions did not render the client's passage to Summit unreasonably difficult or hazardous. (*See* Pls.' Ex. 55P.)

31. Plaintiffs' exhibit 550 depicts the May 23, 1995 violation alleged in the Second Amended Complaint. (*See* Second Am. Compl. ¶ 19(f) (alleging "On or about May 23, 1995, defendant Vazquez obstructed a clinic client from exiting a car.").) The exhibit shows several escorts and sidewalk counselors gathered near a taxi cab as it arrives at the curb in front of Summit. Contrary to escort Love's testimony, Vazquez was not the first person to approach the taxi. When Vazquez approached the taxi, she spoke to the client through the window and handed her some pamphlets. The taxi drove away after an escort, not Vazquez, attempted to open the client's door. Contrary to the plaintiffs' claims, the court concludes that Vazquez did not obstruct the client from exiting the taxi. In fact, from the moment the taxi approached the sidewalk in front of Summit to the moment that it left, the client never attempted to exit it. At one point an escort was able, despite Vazquez's presence, to open the client's door, but, according to Vazquez (the only witness who testified about the client's actions), the client closed the door and directed the taxi driver to leave.

32. In addition to these specific allegations, the plaintiffs allege that Vazquez engaged in "obstructive conduct on a regular basis at Summit" in violation of FACE. (*See* Second Am. Compl. ¶ 18.) Several clinic escorts testified about generalized interference by Vazquez on unidentified occasions and dates. After careful and extensive review of all the testimony and videotape and documentary evidence, the court concludes that the plaintiffs have failed to prove by a preponderance of the evidence that Vazquez engaged in "obstructive conduct on a regular basis at Summit" in violation of FACE. In analyzing this evidence concerning Vazquez's conduct, the court is aware that it must strike a balance between conduct which "by physical obstruction, intentionally injures, intimidates or interferes with" an escort's or

patient's access to Summit, and "expressive conduct (including peaceful picketing or other peaceful demonstration) [which is] protected from legal prohibition by the First Amendment to the Constitution." *See* 18 U.S.C. §§ 248(a) & (d)(1). According to the testimony of the police officers assigned to Summit, Vazquez was courteous and "lady-like" in the way that she counseled patients entering and leaving Summit. While police officers warned and arrested Scott on numerous occasions for blocking patients' access to Summit, standing in front of Summit's entrance and yelling at patients as they entered Summit, they never warned or arrested Vazquez for her conduct. Moreover, even though escorts, in preparation for this case, documented Scott's activities with numerous written complaints, they made *no written* complaints against Vazquez.

30. Thus, in recognition of Vazquez's First Amendment right to leaflet and comment on matters of public concern, a right that receives the utmost protection when exercised on public sidewalks, *see Schenck*, —— U.S. at ——, 117 S.Ct. at 858, the court concludes that Vazquez has not violated FACE.

31. This conclusion is not, nor should it be construed as, a ratification of Vazquez's views or methods of protest. In fact, the court notes that Vazquez has, on occasion, engaged in conduct which bordered on a violation of FACE. If Vazquez, independently or in response to this ruling, should heighten the level of her activity and render passage by clinic escorts or clients any more difficult than it already is, the court may, in a future proceeding, find that her conduct violates the provisions of FACE.

E. *Defendant Riley's Violations of FACE*

32. In order to prove that Riley violated FACE, the plaintiffs were required to prove by a preponderance of the evidence that Riley threatened Luna on January 3, 1995. (*See* Second Am. Compl. ¶ 23.)

33. As the court previously found, the plaintiffs did not present sufficient evidence to show that it was more likely than not that on January 3, 1995, Riley stated to Luna, "95, you are next." Reyes, Carroll, Zimmer-

man and Riley all testified that it was Riley's custom to tell Summit employees that he was praying that they would find other employment. (*See* 3/11/97 Test. Zimmerman; 3/10/97 Test. Reyes; 3/10/97 Test. Riley; 3/7/97 Test. Carroll.) Riley and Zimmerman testified that on January 3, 1995, Riley told Luna that he was praying that she would find a better job in 1995. (*See* 3/11/97 Test. Zimmerman; 3/10/97 Test. Riley.) Finally, while Luna testified that she was not carrying a gun on January 3, 1995 and that Riley's statement frightened her so much that she subsequently applied for and received a gun permit, (*see* 3/5/97 Test. Luna) her testimony was called into question by Pinheiro, who testified that on January 3, 1995, Luna, after telling him what Riley said to her, showed him a gun that she was carrying at the time. (*See* 3/5/97 Test. Pinheiro.) F.

*Scott's Affirmative Defenses*

34. In his Answer, Scott raises numerous affirmative defenses: 1) Congress lacked the authority to enact FACE; 2) the court lacks jurisdiction based on a violation of the Dual Sovereignty Doctrine; 3) the court lacks jurisdiction under Article IV, Section 4 of the United States Constitution; 5) FACE is unconstitutionally vague and overbroad; 6) the claims against Scott are barred by the doctrine of laches and unclean hands; 7) the claims against Scott are barred by the doctrine of selective prosecution; and 8) the relief sought violates the First Amendment.[4]

35. Congress had the authority to enact FACE under the Commerce Clause. (*See* Ruling on Mot. to Dismiss, at 3). *See also Soderna*, 82 F.3d 1370 (7th Cir.1996); *Dinwiddie*, 76 F.3d 913 (8th Cir.1996); *United States v. Wilson*, 73 F.3d 675 (7th Cir. 1995); *Cheffer*, 55 F.3d 1517 (11th Cir.1995); *American Life League*, 47 F.3d 642 (4th Cir.); *White*, 893 F.Supp. 1423 (C.D.Cal. 1995); *Riely*, 860 F.Supp. 693 (D.Ariz.1994); *Council for Life Coalition*, 856 F.Supp. 1422 (S.D.Cal.1994).

36. Article IV, Section 4 of the United States Constitution guarantees to the states a republican form of government.

U.S. Const. art. IV, § 4. Questions arising under this section are political in character and, thus, are not justiciable. *See Baker v. Carr*, 369 U.S. 186, 218, 82 S.Ct. 691, 710–11, 7 L.Ed.2d 663 (1962); *Risser v. Thompson*, 930 F.2d 549, 552 (7th Cir.), *cert. denied*, 502 U.S. 860, 112 S.Ct. 180, 116 L.Ed.2d 142 (1991).

37. The dual sovereignty doctrine is an exception to the Double Jeopardy Clause that permits separate governments to prosecute the same defendant under their respective laws. *See United States v. Certain Real Property and Premises Known as 38 Whalers Cove Dr., Babylon, N.Y.*, 954 F.2d 29, 38 (2d Cir.), *cert. denied sub nom Levin v. United States*, 506 U.S. 815, 113 S.Ct. 55, 121 L.Ed.2d 24 (1992). The plaintiffs did not violate this doctrine by jointly filing this action under FACE.

38. As to Scott's claim that FACE is overbroad and vague, the court finds it to be without merit.

39. "[T]he overbreadth doctrine is 'strong medicine' to be applied 'sparingly and only as a last resort.' " *American Life League*, 47 F.3d at 652–3 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973)).

40. "A statute is overbroad if 'it reaches a substantial number of impermissible applications.' " *Dinwiddie*, 76 F.3d at 924 (quoting *New York v. Ferber*, 458 U.S. 747, 771, 102 S.Ct. 3348, 3362, 73 L.Ed.2d 1113 (1982)).

41. To sustain an overbreadth challenge, "[p]laintiffs thus must demonstrate from the text of FACE and from actual fact that a substantial number of instances exist in which FACE cannot be applied constitutionally." *Council for Life Coalition*, 856 F.Supp. at 1429 (citation omitted)

42. "Absent such a showing [that FACE is subject to numerous unconstitutional applications], whatever overbreadth may exist can be cured through case–by–case analysis of the fact situations to which FACE's prohibitions may not be applied." *Council for Life Coalition*, 856 F.Supp. at 1429.

---

4. The court does not address the legal and equitable defenses raised by defendants Vazquez and

Riley because it finds that they did not violate FACE.

43. "Where, as here, 'conduct and not merely speech is involved ... the overbreadth ... must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.'" *Council for Life Coalition*, 856 F.Supp. at 1429 (quoting *Broadrick*, 413 U.S. at 615, 93 S.Ct. at 2918).

44. FACE "prohibits only a limited range of activity [and] is not even close to being overbroad." *Dinwiddie*, 76 F.3d at 924.

45. "The vagueness doctrine is concerned with clarity. A statute is unconstitutionally vague if it does not give a 'person of ordinary intelligence a reasonable opportunity to know what is prohibited....'" *American Life League*, 47 F.3d at 653 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972)).

46. Statutes are not impermissibly vague if they "'define the ... offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *CISPES v. FBI*, 770 F.2d 468, 475 (5th Cir.1985) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983)).

47. The meaning of the terms used in FACE is "quite clear." *Dinwiddie*, 76 F.3d at 924.

48. FACE goes further than the anti–picketing law upheld in *Cameron*, "speak[ing] in clear, common words," defining many of its terms so as to "inform those opposed to abortion that they will not offend this law by peaceful, non–obstructive [protest]." *American Life League*, 47 F.3d at 653.

49. The definition of "physical obstruction" in FACE is sufficiently definite to survive a vagueness challenge. *See Soderna*, 82 F.3d at 1377. *See also Cameron*, 390 U.S. at 618, 88 S.Ct. at 1339 (upholding statute which prohibited engaging in "picketing or mass demonstrations in such a manner as to obstruct or unreasonably interfere with free ingress to or egress from any public premises ...."); *International Society for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 831–32 (5th Cir.1979) (holding that phrase "in anywise obstruct, delay or interfere with the free movement of any other person" was not unconstitutionally vague); *Arbeitman v. District Court of Vt.*, 522 F.2d 1031, 1033 (2d Cir.1975) (holding that phrase "obstruct vehicular or pedestrian traffic" was not unconstitutionally vague).

50. The terms "force or threat of force" are "readily understandable terms that are used in everyday speech." *Dinwiddie*, 76 F.3d at 925. *See also Council for Life Coalition*, 856 F.Supp. at 1429 (citing *United States v. Gilbert*, 813 F.2d 1523 (9th Cir.) (upholding against vagueness challenge Fair Housing Act provision prohibiting the use of "force or threat of force"), *cert. denied*, 484 U.S. 860, 108 S.Ct. 173, 98 L.Ed.2d 127 (1987)).

51. As to Scott's defense of unclean hands, such equitable defenses against the government "are strictly limited." *SEC v. Electronics Warehouse, Inc.*, 689 F.Supp. 53, 73 (D.Conn.1988) (citing *Schweiker v. Hansen*, 450 U.S. 785, 788, 101 S.Ct. 1468, 1470–71, 67 L.Ed.2d 685 (1981) and *Heckler v. Community Health Services*, 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984)), *aff'd*, 891 F.2d 457 (2d Cir.1989), *cert. denied sub nom Calvo v. SEC*, 496 U.S. 942, 110 S.Ct. 3228, 110 L.Ed.2d 674 (1990).

52. Generally, equitable doctrines "'may not be invoked against a government agency which is attempting to enforce a congressional mandate in the public interest.'" *Electronics Warehouse, Inc.*, 689 F.Supp. at 73 (quoting *SEC v. Gulf & Western*, 502 F.Supp. 343, 345 (D.D.C.1980)).

53. "Where courts have permitted equitable defenses to be raised against the government, they have required that the agency's misconduct be egregious and the resulting prejudice to the defendant rise to a constitutional level." *Electronics Warehouse, Inc.*, 689 F.Supp. at 73 (citing *SEC v. Masella*, 38 Fed.R.Serv.2d 426, 428 (S.D.N.Y.1983)). Scott has neither presented evidence of government misconduct, nor evidence of any prejudice that he suffered. Thus, his defense of unclean hands lacks merit.

54. Scott's defense of laches is equally without merit. Laches is "an equitable defense based on the maxim vigilantibus non dormientibus aequitas subvenit (equity aids the vigilant, not those who sleep on their rights)." *Ivani Contracting Corp. v. City of N.Y.,* 103 F.3d 257, 259 (2d Cir.1997) (citation omitted). The plaintiffs filed the Complaint on June 21, 1995 alleging, *inter alia,* that Scott violated FACE on specific and unknown dates in 1994 and 1995. Scott has presented no evidence showing, nor can the court find, that the plaintiffs somehow delayed the filing of this action or in anyway slept on their rights.

55. Finally, the court also finds Scott's defense of selective prosecution to be without merit.

56. "[The] Attorney General and the United States Attorney retain broad discretion to enforce the Nation's ... laws." *United States v. Armstrong,* — U.S. —, —, 116 S.Ct. 1480, 1486, 134 L.Ed.2d 687 (1996) (citations and internal quotation marks omitted). "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute ... generally rests entirely in his discretion." *Id.* (citation omitted). *See also LeClair v. Saunders,* 627 F.2d 606, 608 (2d Cir.1980) (stating "[m]ere failure to prosecute other offenders is not a basis for a finding of a denial of equal protection"), *cert. denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981).

57. "Probable cause" is defined as evidence "'as may fairly lead the reasonable mind to the belief ... that, in the absence of hitherto unknown qualifying or rebutting evidence, the prosecution or other suit ought to be successful.'" *Pinsky v. Duncan,* 79 F.3d 306, 312 (2d Cir.1996) (quoting Bishop, *Commentaries on the Non–Contract Law* § 239 (1889)).

58. As the court previously held in response to Vazquez's and Riley's Motion for Judgment as a Matter of Law, the plaintiffs had probable cause to file this suit.

59. Furthermore, selective prosecution cannot be shown by the enforcement of a statute against one member of a protected class but not another member of the *same protected class;* instead, "the claimant must show that similarly situated individuals *of a different race* [or, here, religious or political viewpoint] were not prosecuted." *Armstrong,* — U.S. at —, 116 S.Ct. at 1487 (citing *Ah Sin v. Wittman,* 198 U.S. 500, 25 S.Ct. 756, 49 L.Ed. 1142 (1905)) (emphasis added).

60. Even if a defendant was chosen for prosecution because he or she was a leader of an organization or group, this fact alone would not support a claim of selective prosecution. *See, e.g., United States v. Taylor,* 693 F.2d 919 (9th Cir.1982) (holding that it was permissible to prosecute strike leader because it might deter others from striking). *See also United States v. Cooley,* 787 F.Supp. 977 (D.Kan.1992) (holding that it was permissible to prosecute abortion protesters who jumped fence and blockaded gate from inside and not those who blockaded gate from outside), *vacated on other grounds,* 1 F.3d 985 (10th Cir.1993).

61. Again, Scott has presented no evidence to show that he was treated differently than members of a *different* group (e.g., a group of pro–choice demonstrators) who were not prosecuted for violating FACE. In fact, from the evidence presented at trial, it appears that no pro–choice supporters demonstrated at Summit. As to the escorts, according to the testimony and videotape exhibits, they did not engage in picketing, leafletting or other forms of demonstrating engaged in by Scott. The escorts in this case belong to a class of people protected by FACE, not to a class that could potentially be prosecuted for violating FACE.

G. *Constitutionality of Injunctive Relief*

62. "'Injunctive relief should be narrowly tailored to fit specific legal violations.'" *Peregrine Myanmar Ltd. v. Segal,* 89 F.3d 41, 50 (2d Cir.1996) (quoting *Waldman Publ'g Corp. v. Landoll, Inc.,* 43 F.3d 775, 785 (2d Cir.1994)).

63. The need to narrowly tailor injunctive relief requires the court to delineate the

"specific legal violations" in the instant case before injunctive relief can issue. *Id.*

64. "[A]n injunction should not impose unnecessary burdens on lawful activity." *Waldman,* 43 F.3d at 785.

65. The proper inquiry in evaluating the constitutionality of an injunction issued as relief for violations of common law causes of action is "whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." *Madsen,* 512 U.S. at 765, 114 S.Ct. at 2525 (citations omitted). *See also Schenck,* —— U.S. at ——, 117 S.Ct. at 864.

66. The governmental interests in ensuring safe and adequate access to health care, including reproductive health care, in protecting the public safety and order, in protecting property, and promoting the free flow of traffic on streets and sidewalks, and in medical privacy, are significant. *See Madsen,* 512 U.S. at 767–68, 114 S.Ct. at 2526; *Schenck,* —— U.S. at ——, 117 S.Ct. at 866.

67. The governmental interests are particularly strong in the context of medical facilities. *See Madsen,* 512 U.S. at 772, 114 S.Ct. at 2528 (citing *NLRB v. Baptist Hosp., Inc.,* 442 U.S. 773, 783–84 n. 12, 99 S.Ct. 2598, 2604 n. 12, 61 L.Ed.2d 251 (1979)) (upholding noise restriction)).

68. "In some situations, a record of abusive conduct makes a prohibition on classic speech in limited parts of a public sidewalk permissible." *Schenck,* —— U.S. at ——, 117 S.Ct. at 867. *See also Planned Parenthood Shasta–Diablo, Inc. v. Williams,* 10 Cal.4th 1009, 43 Cal.Rptr.2d 88, 898 P.2d 402 (1995) (upholding an injunction which required anti–abortion protestors to conduct protests across street from clinic), *cert. denied,* —— U.S. ——, 117 S.Ct. 1285, —— L.Ed.2d —— (1997).

69. Under *Schenck,* a fixed buffer zone requiring protesters to remain fifteen feet from clinic entrances is constitutional. *See Schenck,* —— U.S. at ——, 117 S.Ct. at 868. The court also notes that, unlike *Schenck,* the allegations in this case involve specific violations of a federal statute. An injunction issued as relief for violations of a federal statute is subject to less stringent scrutiny than an injunction issued as relief for violations of common law. *See SEC v. Management Dynamics,* 515 F.2d 801, 808 (2d Cir.1975) (holding that there is no need to show irreparable harm or inadequacy of other remedies in suit for injunction to remedy violation of federal statute); *United States v. Diapulse,* 457 F.2d 25, 28 (2d Cir. 1972) (stating "[t]he passage of a statute is in a sense, an implied finding that violations will harm the public and ought, if necessary, be restrained"); *North Haven Planning & Zoning Comm'n v. The Upjohn Co.,* 753 F.Supp. 423, 428 (D.Conn.) (citations omitted) (same), *aff'd,* 921 F.2d 27 (2d Cir.1990), *cert. denied,* 500 U.S. 918, 111 S.Ct. 2016, 114 L.Ed.2d 102 (1991).

70. The Court in *Schenck,* however, did not decide "whether the governmental interests involved would ever justify some sort of zone of separation between individuals entering the clinics and protesters, measured by the distance between the two. . . ." *Schenck,* —— U.S. at ——, 117 S.Ct. at 867. Instead, the Court simply struck down the fifteen foot "floating buffer zone" as too broad a prohibition on First Amendment rights. *Id.*

71. In the present case, the court is *not* constructing a floating buffer zone. Rather, the permanent injunction creates within the streets and parking areas in the immediate vicinity of Summit (*see* App. A), a "zone of separation between individuals entering the clinics and [Scott], measured by the distance between the two."

72. Such a zone of separation is necessary to protect patients from face to face confrontations with Scott such as those depicted in plaintiffs' exhibits 40 and 55M.

73. "A nose to nose confrontation is hardly essential to the conveying of the protestors' views and will, given their history of intimidation, be reasonably perceived by those seeking to enter the clinic as intimidating." *Pro–Choice Network of W. N.Y. v. Schenck,* 67 F.3d 377, 397 (2d Cir.1995) (*en banc*) (Winter, J., concurring)

74. "[T]here is no right to invade the personal space of individuals going about lawful business, to dog their footsteps or

chase them down a street, to scream or gesticulate in their faces, or to do anything else that cannot fairly be described as an attempt at peaceful persuasion." *Id.* at 396.

75. The court is mindful that "in public debate, our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment." *Madsen,* 512 U.S. at 774, 114 S.Ct. at 2529 (quoting *Boos v. Barry,* 485 U.S. at 322, 108 S.Ct. at 1164).

76. However, "the First Amendment does not, in any context, protect coercive or obstructionist conduct that intimidates or physically prevents individuals from going about ordinary affairs.... Advocates have a right to a full opportunity to appeal to reason, interest, policy, or morals, but they have no right to seek to alter the mind or conduct of the audience by coercion or obstruction.... [W]here specific individuals are targeted at locations difficult or inconvenient for them to avoid, the First Amendment's tolerance of plausibly coercive or obstructionist conduct is least...." *Pro–Choice Network of W.N.Y.,* 67 F.3d at 394–96 (Winter, J., concurring).

H. *Injunctive Relief is Warranted as to Scott*

77. Civil remedies under FACE include injunctive relief. 18 U.S.C. § 248(c)(1)(A).

78. If the Court finds that the precise relief requested by the plaintiffs is not entirely appropriate, it may order such other relief as it deems appropriate. Rule 54(c), Fed.R.Civ.P.

79. "Under general equity principles, an injunction issues only if there is a showing that the defendant has violated, or imminently will violate, some provision of statutory or common law, and that there is a 'cognizable danger of recurrent violation.'" *Madsen,* 512 U.S. at 765 n. 3 114 S.Ct. at 2524 n. 3 (quoting *United States v. WT Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953)).

80. "An injunction prohibiting a party from violating statutory provisions is appropriate where 'there is a likelihood that, unless enjoined, the violations will continue.'" *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1477 (2d Cir.1996) (quoting *Commodity Futures Trading Comm'n v. American Bd., of Trade, Inc.,* 803 F.2d 1242, 1250–51 (2d Cir. 1986)). *See also SEC v. Posner,* 16 F.3d 520, 521–22 (2d Cir.1994).

81. In the present case, the court has found that Scott, on numerous occasions, violated FACE by force, threats of force, and physical obstruction. Further, based on Scott's prior conduct, there is a substantial likelihood that unless enjoined, such violations will continue. Thus, injunctive relief is warranted.

## CONCLUSION

For the reasons stated above, the court finds that defendant Stanley Scott has violated, and is likely to commit future violations of, the provisions of FACE. The court also finds that defendants Carmen Vazquez and Bobby Riley have not violated the provisions of FACE. Accordingly, the court ORDERS that defendant Scott is enjoined in accordance with the Order of Permanent Injunction filed contemporaneously with this Memorandum of Decision.

SO ORDERED this 2nd day of April, 1997 at Bridgeport, Connecticut.

N

Parking #1

Parking #3

Gold Street

Parking #2

Summit

Sidewalk

Main Street

Middle Street

Golden Hill Street

Appendix A

*ORDER*

In light of the court's finding that defendant Stanley G. Scott violated provisions of the Freedom of Access to Clinic Entrances Act, 18 U.S.C. §§ 248(a)—248(e), by using force, threat of force and physical obstruction to intentionally injure, intimidate and interfere with persons who were obtaining or providing reproductive health services at the Summit Women's Center ("Summit") in Bridgeport, Connecticut, it is HEREBY ORDERED that Stanley G. Scott, and persons in active concert with him who receive actual or constructive notice of this injunction, are permanently ENJOINED from:

1) Threatening, either orally or in writing, any person who is or has been obtaining or providing reproductive health services at Summit;

2) Impeding or obstructing any such person's free access to or egress from Summit;

3) Using their bodies, signs or other objects to push, shove, bump, step on, or engage in any other physical shove, bump, step on, or engage in any other physical contact with any such person;

4) Coming within fourteen feet (14') of any entrance to Summit, or being present in that portion of the street directly in front of Summit which is designated as a no-parking zone; and

5) Yelling, shouting and using bullhorns, auto horns or other sound amplification equipment within the following areas:

a) On Middle Street, between Golden Hill Street and the parking lot one block north of Gold Street, shown on Appendix A as "Parking # 1;"

b) In any area in the parking lot shown on Appendix A as "Parking # 1;"

c) On Gold Street, between Main Street and Middle Street;

d) In the parking lot at the corner of Gold Street and Main Street, shown on Appendix A as "Parking # 2;"

e) In the parking lot diagonally across the street from Summit, shown on Appendix A as "Parking # 3;" and

f) On the public roadways and sidewalks which connect the parking lot shown on Appendix A as "Parking # 3" to the sidewalk directly in front of Summit.

In light of the court's findings that defendant Stanley G. Scott has repeatedly come into physical contact with clinic escorts and has repeatedly obstructed the path of clinic patients, it is FURTHER ORDERED that each day from and including Tuesday through Saturday, between the hours of 7:00 a.m. and 6:00 p.m., within an area in downtown Bridgeport bounded by Main Street, Golden Hill Street, Middle Street, and Gold Street (including the sidewalks and roadways), and within the three parking lots that are used by persons obtaining or providing services at Summit, shown on Appendix A as "Parking # 1," "Parking # 2" and "Parking # 3," and the portion of the public sidewalks and roadways which abut these three parking lots, Stanley G. Scott, and persons in active concert with him who receive actual or constructive notice of this injunction, are permanently ENJOINED from:

1) Coming within five feet (5') of any person who is or has been obtaining or providing reproductive health services at Summit *once* that person indicates verbally that he or she does not want to accept literature or listen to any communication or counseling; and

2) Coming within five feet (5') of an automobile occupied by any such person *once* that person indicates verbally that he or she does not want to accept literature or listen to any communication or counseling.

For the purposes of this ORDER, a Summit escort is a "person who is or has been obtaining or providing reproductive health services."

Disobedience of, or resistance to, this ORDER may subject Stanley G. Scott, or any person within the scope of this injunction, to criminal or civil prosecution for contempt of court and the imposition of such sanctions as the court deems proper. These sanctions may include incarceration or detention, the posting of a bond, monetary penalties, payment of damages to aggrieved persons or entities, payment of reasonable attorney's fees and costs in connection with a contempt

action, and other sanctions deemed appropriate by the court.

SO ORDERED this 2nd day of April, 1997 at Bridgeport, Connecticut.