UNITED STATES of America and State of Connecticut, as parens patriae, Plaintiffs–Counter–Defendants–Appellees,

v.

Stanley G. SCOTT, Defendant–Appellant,

Carmen E.F. Vazquez, Defendant–Counter–Claimant,

Bobby J. Riley, Defendant,

Connecticut Women's Education and Legal Fund, Amicus Curiae,

Summit Women's Center, Movant,

Hartford Courant Company, Inc. and Mark Pazniokas, Interested Parties.

No. 98–6087.

United States Court of Appeals, Second Circuit.

Argued Feb. 22, 1999.

Decided Aug. 4, 1999.

**283**

---

**283**

Stanley G. Scott, Fairfield, CT, Pro Se.

Richard Blumenthal, Attorney General for the State of Connecticut, Hartford, CT (Jennifer C. Jaff, Assistant Attorney General, on the brief), for Plaintiff–Counter–Defendant–Appellee State of Connecticut.

Sharon E. Jaffe, Assistant United States Attorney, Bridgeport, CT (Stephen C. Robinson, United States Attorney for the District of Connecticut) for Plaintiff–Counter–Defendant–Appellee United States of America.

Lucinda M. Finley, Buffalo, NY, for Amicus Curiae Connecticut Women's Education and Legal Fund.

Before: LEVAL, POOLER, and HEANEY * Circuit Judges.

POOLER, Circuit Judge:

The district court found that defendant Stanley G. Scott's actions during anti-abortion protests and demonstrations outside Summit Women's Center ("Summit") in Bridgeport, Connecticut, violated the Freedom of Access to Clinic Entrances Act ("FACE"), 18 U.S.C. § 248. As a result of his violations, the court enjoined Scott from demonstrating within fourteen feet of Summit's entrance and from positioning himself within five feet of persons or vehicles in the vicinity of Summit once an individual indicated that he or she did not wish to talk with or receive literature from Scott. After he repeatedly violated the injunction, the court held Scott in contempt and expanded the injunction. Scott challenges the expanded injunction as an undue burden on his speech rights. We hold that given Scott's record of harassing and abusive conduct, his repeated violations of the district court's orders, and the very real safety concerns his actions present, the expanded injunction did not violate his First Amendment rights. We therefore affirm.

## BACKGROUND

In June 1995, the United States of America and the State of Connecticut (col-

---

* The Honorable Gerald W. Heaney, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

lectively, "the Government") brought this action against Scott and two other anti-abortion protestors alleging violations of FACE[1] at Summit, a state-licensed clinic providing pregnancy testing, abortion services, and other gynecological and reproductive health services in Bridgeport, Connecticut. *See United States v. Scott*, 958 F.Supp. 761, 764–65 (D.Conn.1997). The Government alleged that since July or August 1994, Scott repeatedly had violated FACE by the use of force, the threat of force, and physical obstruction outside Summit and was likely to continue this conduct in the future.

After a nine-day bench trial, the district court issued findings of fact and conclusions of law. We summarize those findings that are relevant to this appeal. Scott, who describes his anti-abortion activities as part of a "holy war," has demonstrated at Summit since 1975 and regularly protests in front of the clinic and along the streets and parking lots in the surrounding area. *Id.* at 767. While demonstrating, Scott often carries a sign, approximately 2½ feet by 1½ feet, which contains an enlarged reprint of a July 1993 newspaper article about a woman who died from complications arising from an abortion. *See id.* He has used this sign as a "battering ram" to block Summit volunteers who escort clients into the clinic from walking with clients; he also has on occasion used a sound amplification device to assist him in broadcasting his message in front of the clinic. *See id.* at 767–68. "Scott regularly obstructs free ingress to, and egress from Summit by stepping in front of escorts; using his sign to prevent escorts from walking past him; positioning himself next to patients' automobiles so that they have difficulty opening their car doors; and following patients to and from the Summit

entrance after they have indicated that they do not wish to talk with him." *Id.* Scott runs at patients and yells at them, often provoking angry and heated responses that on numerous occasions have escalated into physical confrontations. *See id.* at 768–69. By his own admission, patients and their companions have hit, slapped, and maced Scott in response to his attempts to persuade women not to have abortions. *See id.* at 769. Scott repeatedly pushes escorts and threatens Summit personnel, on one occasion telling a Summit security guard, "[a] bullet could come your way today." *See id.* at 770.

The district court also found that on as many as twenty occasions, Bridgeport police officers restrained Scott and warned him not to block patients' passage to the clinic; on forty or fifty occasions officers warned Scott not to stand in front of the clinic entrance; and on approximately thirty occasions, officers warned Scott about the volume of his voice, which could be heard throughout the clinic. *See id.* at 769. From 1988 through 1996, Scott was arrested fourteen times for, among other things, breach of the peace, disorderly conduct, harassment, and third-degree assault. *See id.* at 768.

In its conclusions of law, the court found that Scott violated FACE by the use of force on numerous occasions and that he "repeatedly crossed the line from protected First Amendment activity to unprotected physical contact." *Id.* at 775. The court also concluded that Scott violated FACE on multiple occasions "by using physical obstruction to intentionally injure, intimidate or interfere with, or attempt to injure, intimidate or interfere with, Summit patients, escorts, and staff because they were obtaining or providing reproductive health services" and on at least two

1. Pursuant to FACE, any person who
 by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any oth-er person or any class of persons from, obtaining or providing reproductive health services
 may be enjoined from such conduct, imprisoned, and/or ordered to pay compensatory relief or a criminal penalty. *See* 18 U.S.C. § 248(a)-(c).

occasions by using the threat of force. *Id.* at 775–76.

Because the court concluded that there was a substantial likelihood that Scott would continue to violate FACE, it issued an injunction that, among other things, prevented Scott from "[c]oming within fourteen feet (14') of any entrance to Summit, or being present in that portion of the street directly in front of Summit which is designated as a no-parking zone." *Id.* at 782, 784. The court also enjoined Scott from "[c]oming within five feet (5') of any person who is or has been obtaining or providing reproductive health services at Summit" or within five feet of an automobile occupied by any such person "once that person indicates verbally that he or she does not want to accept literature or listen to any communication or counseling."[2] *Id.* The court specified that for purposes of the injunction, clinic escorts "provide[d] reproductive health services." *Id.*

Scott filed no appeal from the district court's order, but he did file motions to alter or amend the judgment pursuant to Fed.R.Civ.P. 59(e) and District of Connecticut Local R. 9(e). The court denied Scott's motions. *See United States v. Scott,* 975 F.Supp. 428, 434 (D.Conn.1997). Again, Scott took no appeal.

Thereafter, in June 1997, the Government moved by order to show cause to hold Scott in civil contempt for violating the injunction. After a hearing, the district court concluded that Scott had "repeatedly violated the injunction" by yelling and shouting so that he could be heard within Summit, standing within the fourteen-foot buffer zone around the clinic entrance, and failing to retreat five feet upon the request of patients seeking access to the clinic. *See United States v. Scott,* No. 3:95CV1216 (AHN), 1997 WL 889513, at *1

(D.Conn. Aug.1, 1997). The court fined Scott $200 but offered him the opportunity to purge himself of the contempt violation by complying with the injunction for a period of ninety days. *See id.* at *2. Upon the Government's motion, the court held another hearing and determined that Scott had continued to violate the injunction and thus had failed to purge himself of contempt. *See United States v. Scott,* 3:95cv1216(AHN), slip op. at 2 (D.Conn. Nov. 12, 1997).

The Government sought another finding of civil contempt in February 1998, alleging that Scott had violated the injunction on multiple occasions by yelling loudly enough to be heard inside the clinic, failing to retreat five feet when asked to do so, preventing people from exiting their vehicles, and coming within fourteen feet of the clinic entrance. After a two-day hearing, the district court found that on thirty-one occasions Scott yelled loudly enough to be heard inside the clinic, and that on more than one occasion Scott violated the injunction by failing to retreat five feet from a person or vehicle after being asked and failing to observe the fourteen-foot buffer zone around the clinic entrance. *See United States v. Scott,* No. 3:95CV1216 (AHN), 1998 WL 241755, at *1–2 (D.Conn. March 16, 1998). The court also found that "[o]n at least one occasion, Scott positioned himself so close to an individual's car door that he made it difficult for her to exit her vehicle." *Id.* at *2. Based upon these findings, the district court held Scott in contempt. *See id.* In light of Scott's repeated violations of the injunction and "continued refusal to obey this order, despite previous contempt findings and fines levied by the court," the court modified the injunction by (1) expanding the fourteen-foot buffer zone around Summit's entrance to 28 feet; and (2) expanding from five feet to eight feet the buffer zone around

---

**2.** "Sidewalk counseling" is a term abortion protestors use to describe the activities of persons who stand outside clinics that provide reproductive health services and offer pro-life literature, factual information, and personal opinions about abortion to persons who enter the clinics. *See United States v. Scott,* 958 F.Supp. at 765. The ultimate purpose of "sidewalk counseling" is to dissuade women from having abortions. *See id.*

persons and their vehicle after they have verbally indicated that they do not want to receive literature or "counseling." *See id.* The court also prohibited Scott from being present anywhere on the street in front of Summit unless he was crossing the street. *See id.* In so modifying the injunction, Judge Nevas noted his concern "not only for the safety of those entering and leaving the clinic, but also for Scott's own safety," and observed that "[a]ccording to the videotape evidence, one individual attempted to hit Scott with her car after he refused to abide by her request to move back and another individual accompanying a woman into the clinic pushed Scott out of his way as he was walking [toward] the clinic." *Id.*[3]

Scott appeals from the district court's March 16, 1998, order expanding the buffer zones around the clinic entrance ("fixed buffer zone") and around persons and vehicles ("floating buffer zone").

## DISCUSSION

 Although Scott appealed from the March 16, 1998, order as a whole, he makes no arguments against the district court's expansion of the fixed buffer zone or its prohibition against his presence in the street in front of Summit. Scott's principal contention on appeal is that the eight-foot "floating buffer zone" around persons and vehicles in the vicinity of Summit violates the First Amendment because it makes "compliance impossible without withdrawing to such a distance as to make even the most peaceful and quiet communication impossible."[4]

In assessing the constitutionality of the expanded floating buffer zone, we must first determine whether it is content-based or content-neutral, that is, whether the injunction regulates expression "without reference to the content of the regulated speech." *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (internal quotation marks and citation omitted). The relevant consideration is whether the justifications underlying the issuance of the injunction refer to the content of the restricted ex-

**3.** On June 15, 1998, in response to plaintiffs' application, Scott appeared to show cause why he should not be held in contempt of the expanded injunction. *See United States v. Scott,* 3:95CV1216, 1998 WL 386483, *2 (D.Conn. June 25, 1998). The court concluded that Scott had violated the injunction and again held him in contempt. *See id.* at *3. However, the court refused to grant plaintiffs' request to further modify the injunction to prevent Scott from coming within 56 feet of the clinic so that, in order to protest, he would have to stand on the opposite side of the street from the entrance. *See id.* at *3–4. The court noted that although Scott was in contempt of the provision of the injunction that prevented him from yelling loudly in front of the clinic, he appeared to be complying with the other portions of the injunction. *See id.* at *3 (noting that "without the benefit of a tape measure, it is impossible to know if he always steps back eight feet when a patient verbally refuses his counseling or literature, but the videotape evidence shows that he generally backs off when a patient tells him to do so") (footnote omitted).

**4.** Scott also argues that the district court erred by continuing certain provisions of the original injunction. However, challenges to (1) the court's initial finding that Scott violated FACE or (2) the initial injunction are not before the court because Scott did not timely appeal from the court's April 2, 1997, order. *See United States v. Rylander,* 460 U.S. 752, 756, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983) ("a contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy") (quoting *Maggio v. Zeitz,* 333 U.S. 56, 59, 68 S.Ct. 401, 92 L.Ed. 476 (1948)); *see also United States v. Terry,* 17 F.3d 575, 579 (2d Cir.1994) (same). Although "[a]n exception to the prohibition against collateral attack exists where the injunction is transparently invalid," the preliminary injunction in this case was not so far in excess of the court's authority that it had no right to expect compliance." *Id.* (internal quotation marks and citation omitted). Moreover, the "transparently invalid" exception requires as a precondition to its application "a showing that the party made a good faith effort to seek emergency relief from the appellate court." *Id.* (internal quotation marks and citation omitted). Scott has not satisfied this condition.

pression. *See id.* (examining content neutrality of local ordinance and concluding that "[a] regulation that serves purposes unrelated to the content of the expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others"). Contrary to Scott's contentions, the Supreme Court has rejected the argument that an injunction is content-based simply because it restricts only the speech of anti-abortion protestors. *See Madsen v. Women's Health Center, Inc.,* 512 U.S. 753, 762–63, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (holding that the fact that injunction at issue did not restrict the expression of those demonstrating in favor of abortion rights was "justly attributable to the lack of any similar demonstrations by those in favor of abortion [rights]" and noting that "the state court imposed restrictions on petitioners incidental to their antiabortion message because they repeatedly violated the court's original order"). We conclude that the purpose of the modified injunction at issue on this appeal was content neutral: the district court expanded the injunction in response to Scott's repeated disregard of the court's prior orders and did so out of a concern "not only for the safety of those entering and leaving the clinic, but also for Scott's own safety." *United States v. Scott,* 1998 WL 241755, at *2.

■ In evaluating the constitutionality of a content-neutral injunction, we apply the test that the Supreme Court articulated in *Madsen:* "whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." *Madsen,* 512 U.S. at 765, 114 S.Ct. 2516. The Government asserts interests in protecting a woman's freedom to seek pregnancy-related services, ensuring public safety and order, promoting the free flow of traffic, and providing a calm and secure environment in which to seek health-related services. The Supreme Court has recognized that "the combination of these interests [is] 'quite sufficient to justify an ap-

propriately tailored injunction.'" *See Schenck v. Pro–Choice Network of Western New York,* 519 U.S. 357, 117 S.Ct. 855, 864, 137 L.Ed.2d 1 (1997) (quoting *Madsen,* 512 U.S. at 768, 114 S.Ct. 2516). The central question of this case is thus whether the challenged injunction burdens more speech than is necessary.

In *Schenck,* the Supreme Court assessed the constitutionality of an injunction that, among other things, created "floating buffer zones" around people entering and leaving certain reproductive health care clinics. *See id.* at 866–68. Specifically, the injunction prevented the defendant protestors from demonstrating or "counseling" within fifteen feet of any person entering or leaving the clinic. *See id.* at 862 and 861–62 n. 3. As an exception to this provision, the injunction allowed two sidewalk "counselors" to have "a conversation of a non-threatening nature" with individuals entering or leaving the clinic. *See id.* at 861 n. 3. However, if the individuals indicated that they did not want to receive the "counseling," the injunction required the "counselors" to "cease and desist" from their "counseling" activities and retreat outside the fifteen-foot zone. *See id.* at 862.

The Court observed that "[l]eafletting and commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment, and speech in public areas is at its most protected on public sidewalks, a prototypical example of a traditional public forum." *Id.* at 867. The Court concluded that the particular injunction posed practical problems for persons attempting to comply with its terms, in part because the sidewalk at one of the clinics was only seventeen feet wide, and protestors might be "pushed into the street," and in part due to the practical difficulties associated with maintaining a fifteen-foot buffer around several individuals who might move at once in different directions. *See id.* at 867. The Court stated that "[t]his lack of certainty leads to a substantial risk that much

more speech will be burdened than the injunction by its terms prohibits" because a protestor wishing to speak to one individual from the permitted distance of fifteen feet might be forced to stand further away due to the proximity of another individual. *See id.* Noting that "there may well be other ways to both effect ... separation and yet provide certainty (so that speech protected by the injunction's terms is not burdened)," the Court held, based on the record before it, that it could not sustain the floating bubble. *See id.* at 867–68.

Despite its conclusion that the challenged injunction failed on the facts of the particular case before it, the Court recognized that in certain situations, "a record of abusive conduct makes a prohibition on classic speech in limited parts of a public sidewalk permissible." *Id.* at 867. The Court expressly refused to strike down all "floating buffer zones" and left open the question "whether the governmental interests involved would ever justify some sort of zone of separation between individuals entering the clinics and protestors, measured by the distance between the two." *Id.* We conclude that the so-called "floating buffer zone" in this case is distinguishable from the one the Supreme Court struck down in *Schenck* and that Scott's record of harassing and often physically abusive conduct justifies the narrow zone of separation the district court imposed on him.

The "floating buffer zone" in this case differs from the one in *Schenck* in two notable respects. First, the zone of separation imposed on Scott is smaller. The zone in *Schenck*, which required protestors to stay fifteen feet away from persons entering or leaving the clinics, posed potential safety issues because the sidewalk in front of the clinic was only seventeen feet wide and protestors might be "pushed into the street" in their efforts to comply with the injunction. *Schenck*, 117 S.Ct. at 867. The size of the fifteen-foot buffer also prevented the protestors from coming within a normal conversational distance of their intended audience. By contrast, the zone of separation that Scott must maintain is only eight feet, and the sidewalk in front of Summit is thirteen and one-half feet wide. *See United States v. Scott*, 958 F.Supp. at 765. More importantly, the buffer zone in this case is triggered only if a Summit client indicates that she does not want to receive literature or "counseling" from Scott. Until that time, Scott is free to come as close as he wishes to persons entering or leaving the clinic to communicate his message. *Schenck* recognized that a "cease and desist" limitation like the one imposed in this case was an effort "to enhance [protestors'] speech rights and ... must be assessed in that light." *Schenck*, 117 S.Ct. at 870 (internal quotation omitted). Scott's record of harassing and abusive conduct outside Summit justifies the zone of separation the district court imposed. The district court has twice found Scott in contempt of the original injunction. *See Scott*, 1997 WL 889513; *Scott*, 1998 WL 241755 at *1. The court found that Scott had on several occasions failed to retreat five feet from a person or vehicle when asked to do so, and that on at least one occasion Scott positioned himself so close to an individual's car door that he made it difficult for her to exit the vehicle. *See Scott*, 1998 WL 241755, at *2. The record contains evidence of instances of physical confrontations that threaten not just the safety of clinic escorts and clients, but Scott's safety as well. *See id.* Scott's repeated and continued violations of the court's orders and the very real safety issues these violations present justify the 8-foot zone of separation the district court imposed. *See Schenck*, 117 S.Ct. at 867, 870 (conditions imposed on protestors' speech rights were "the result of their own previous harassment and intimidation of patients"). The dissent criticizes the floating buffer as unduly restrictive of Scott's First Amendment rights and suggests possible ways to alter the injunction to afford Scott greater opportunities to communicate his message. However, Scott is not a law-abiding protestor to whom the benefit of all doubt and a

full range of speech rights is to be accorded; rather, he is a serial violator of injunctions that the district court successively fashioned in an attempt to secure for the public safe access to reproductive health care facilities. His "record of abusive conduct" more than justifies the challenged restrictions on his speech. *See Schenck*, 117 S.Ct. at 867. The dissent's proposal to divide the sidewalk to create "fixed lanes," while creative, is not a viable alternative to the buffer zone at issue because it does not adequately protect the government's substantial interests. Under the proposed scenario, it is possible, indeed probable, that Scott could come within inches of clients and clinic escorts, whom the record shows he has repeatedly harassed.[5]

## CONCLUSION

In sum, the district court carefully tailored the expanded injunction to address the particular facts of this case, striking a balance between important government interests on the one hand and the speech rights of a protestor who has repeatedly disregarded the court's earlier injunctions on the other.[6] For this reason, the challenged provision does not burden more speech than is necessary to serve the stated government interest. We therefore affirm the district court's order.

LEVAL, Circuit Judge, dissenting in part:

I respectfully dissent from the portion of the judgment affirming the expansion of the "floating buffer zone."

In *Schenck v. Pro-Choice Network of Western New York,* 519 U.S. 357, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997), the Supreme Court struck down a floating buffer zone that prohibited abortion protestors from coming within 15 feet of persons entering

or leaving medical clinics. *See id.* at 866–67. The Court found that the floating buffer zones "burden more speech than is necessary to serve the relevant governmental interests." *Id.* at 867. Among the problems of the *Schenck* injunction were the following:

- On a public sidewalk, a "prototypical example of a traditional public forum," the 15-foot width of the buffer zone made it impossible for a protestor to talk to a clinic client or escort from a "normal conversational distance." *Id.*
- Indeed, because the protestor was required to maintain a 15-foot separation from escorts as well as clients, escorts could position themselves so as to push the protestor nearly 30 feet from clients.
- The 15-foot buffer also prevented the protestor from offering leaflets to persons entering or leaving the clinic. The Court stated that leafleting on a public street is a "classic form[ ] of speech that lie[s] at the heart of the First Amendment." *Id.*
- Given that the sidewalk was 17-feet wide, if the person entering or leaving the clinic walked near the middle of the sidewalk, the protestor, required to remain 15 feet away, would not be able to walk alongside the person without being "pushed into the street." *Id.*
- Because there could be several buffer zones on the sidewalk at the same time moving independently of each other (one buffer for each person entering or leaving the clinic), a protestor concentrating on communicating with one person would be at substantial risk of violating another person's buffer zone. For example, if a protestor were talking with a client who was

---

5. Moreover, the dissent's concern that Scott's speech will be squelched immediately by clients and escorts invoking the "cease and desist" provision by indicating their desire to be left alone is purely speculative.

6. Although not dispositive of the issue, we note that the district court has subsequently observed that Scott has complied with the expanded buffer zones around the clinic entrance, persons, and vehicles. *See* 1998 WL 386483, at *3.

walking toward the clinic while an escort emerged from the clinic and walked from the clinic toward the protestor, the protestor who continued talking to the client might soon find himself in violation of the buffer surrounding the escort. Similarly, because a protestor might be forced by the narrowness of the sidewalk to walk backwards toward the clinic ahead of the client, the protestor might back into the buffer of another unseen client emerging from the clinic. As a result of the difficulties created by multiple buffers, the Supreme Court observed, "it would be quite difficult for a protestor who wishe[d] to engage in peaceful expressive activities to know how to remain in compliance with the injunction." *Id.*

- Because the floating buffer zones constantly move and the distance defining the buffer needs to be estimated, the zones were likely "quite difficult for a District Court to enforce." *Id.* at 867 n. 9.

The Court concluded that there were other ways to protect the interests of the users of the clinic that would avoid the problems and excesses of the floating buffer zone. *See id.* at 867–68.

Many of the problems of the *Schenck* injunction are also present under this injunction, although in lesser degree.

- The sidewalk in front of the clinic is 13½ feet wide. Scott must maintain a distance of 8 feet from the clients and escorts. He is forbidden to enter the street. If the client walks down the middle of the sidewalk, Scott cannot walk alongside her on the sidewalk, and if he enters the street, he violates the injunction. Scott must therefore either address the client from 8 feet behind her, a particularly unsatisfactory form of communication, or must place himself ahead of her, walking backwards to face the client as she advances.

- Because there may be several simultaneous buffer zones moving independently of each as different individuals approach and leave the clinic, Scott risks to violate the injunction while attempting to engage in protected communication. If he is walking and talking with one patient while another patient approaches from the opposite direction, Scott must either retreat or violate the injunction. In fact, if Scott is on the sidewalk between two protected persons who are approaching one another, there is no way he can avoid violation except by crossing to the opposite side of the street. As a result, Scott may well have serious difficulty "engag[ing] in peaceful expressive activities [and] remain[ing] in compliance with the injunction." *Id.* at 867.[1]

1. The fact that the buffer zones only become operative after a client has told Scott to "cease and desist" does little to alleviate the concerns above. The videotape evidence suggests that the great majority of clients and escorts promptly tell Scott to "cease and desist."

With respect to the "cease and desist" provision, the majority asserts that "*Schenck* recognized that a 'cease and desist' limitation like the one imposed in this case was an effort 'to enhance [protestors'] speech rights and ... must be assessed in that light.' " Maj. Op. at 12 (quoting *Schenck,* 117 S.Ct. at 870). In my view, the quoted passage of *Schenck* does not support the majority's result.

The Supreme Court made the quoted statement in the course of upholding a fixed buffer zone that contained an exception for two "sidewalk counselors" who could approach a person entering or exiting the clinic, provided they retreated upon request. *See Schenck,* 117 S.Ct. at 861 n. 3, 870. With respect to the "cease and desist" requirement, the Court stated, "[w]e doubt that the District Court's reason for including that provision-'to protect the right of the people approaching and entering the facilities to be left alone'-accurately reflects our First Amendment jurisprudence in this area." *Id.* at 870. The Court noted, however, that the district court would have been justified in barring all sidewalk counseling within the fixed buffer zone. *See id.* at 868 n. 11, 870. It was in view of an impermeable buffer zone's reasonableness that the Court noted that "the entire exception for

- Because Scott must maintain an 8–foot distance from escorts as well as the clients, an escort can place herself between him and the client, effectively pushing him to a distance considerably greater than 8 feet from the client.

- The width of the separation between Scott and the client, especially as it can be increased by escorts placing themselves between the two, can prevent Scott from handing the client leaflets and from speaking to her in a normal conversational tone.[2]

- Because the question whether Scott has violated a moving buffer zone depends on observers' ability to estimate distances, it is difficult for everyone, including Scott and the district court, to know whether he has violated the injunction.

If these problems can be eliminated or diminished by altering the terms of the injunction in a manner that does not sacrifice the interests to be protected by the injunction, then the injunction, as fashioned, burdens Scott's speech "more than is necessary to serve the relevant governmental interests." *Id.* at 867. I believe there are other approaches that would suitably protect the interests of the clients and escorts while relieving Scott of the some of the problematic burdens.

The street in front of the clinic is lined by sidewalks 13½ feet wide. The court could divide those sidewalks into two strips; Scott could be required to remain within a strip 5 feet wide (or whatever width was deemed appropriate by the district court) running from the clinic entrance to the corner along the inner or outer edge of the sidewalk. The clients and escorts could use the other 8½-foot strip, which Scott would not be permitted to enter, except to cross it. (The order might, furthermore, forbid Scott from crossing the strip unless he is at a designated crossing and/or at least twenty feet from a person entering or leaving the clinic.) The demarcation line between the strips could be marked on the sidewalk in paint or tape.[3]

I believe use of such a design would substantially diminish the problems outlined above. Scott would be able, while engaging in advocacy, to walk alongside the client at a reasonable proximity, but not so close as to allow him to obstruct or to intimidate patients or escorts. Clients could maintain a reasonable distance between themselves and Scott merely by

sidewalk counselors was an effort to enhance petitioners' speech rights, and the 'cease and desist' limitation must be assessed in that light." *Id.* at 870 (citations and internal quotations omitted). Thus, it was the "exception for sidewalk counselors," not the "cease and desist" provision, that *Schenck* recognized as an "effort to enhance petitioners' speech rights."

In my view, the quoted passage of *Schenck* means only that an otherwise constitutional buffer zone does not become unconstitutional because it offers an exception for certain protestors who are subject to a dubious "cease and desist" limitation. That proposition is not relevant to this case, because the cease-and-desist provision is not a limitation on an exception to a valid buffer zone. In the majority opinion, the quoted passage seems to stand for the very different proposition that an otherwise dubious zone becomes constitutional if the zone applies only when a person requests that a protestor not approach. That assertion is at best unsupported by *Schenck*.

2. The considerations about leafleting and speaking in a normal conversational tone may be less important in this case than they were in *Schenck*. This order enjoins only a single protestor who (1) has resorted to intimidation and obstruction of clinic patients and staff; (2) has not, as far as the record reveals, communicated through leafleting; and (3) seems to prefer to shout, rather than speaking in a normal conversational voice.

3. If the district court considered appropriate to permit Scott to come closer to a client or escort to allow him to offer a leaflet, it could add a peninsula at a fixed location, extending Scott's strip slightly into the prohibited space. At that point alone, the corridor from which the protestor is excluded would be reduced to a 4 or 5 foot width, so that he would have an opportunity at that spot to proffer a leaflet when the client passed at a somewhat closer range.

staying in the remote portion of their strip. Scott would not be forced to walk into the street, or to follow behind or walk backwards ahead of the client. He would not be at risk of violating the injunction while attempting to engage in protected communication. Thus, if Scott were walking and talking with one client while another protected person walked past going in the other direction, Scott would be free to continue addressing the client at the same distance. Escorts would not be able to force Scott to increase the distance between himself and the clients by placing themselves between the two. Markings on the sidewalk could make clear to all concerned, including the district judge, whether Scott was in compliance or violation.[4]

Because I believe an injunction could adequately protect the interests of the clients and personnel of the clinic without imposing on Scott the burdens and uncertainties that result from moving buffer zones on the sidewalk fronting the clinic, I conclude the injunction as drafted needlessly burdens his speech. I would set aside the injunction in the light of the Supreme Court's *Schenck* opinion and direct the district court to consider whether it is practicable to revise the injunction using fixed lanes as suggested above. I therefore respectfully dissent.

---

**4.** I recognize that the parking lot presents a more complicated circumstance that may justify retention of the moving buffer zones. While the use of moving zones in the parking lot would still present difficulties for Scott, this is not necessarily inappropriate. Unlike a public sidewalk, a parking lot is not a "prototypical example of a traditional public forum." *Id.* at 867. Furthermore, the injunction might be modified to state that Scott does not violate it if, while he is engaging in lawful communication with one person, he enters the buffer zone surrounding another person who he is making no effort to communicate with or obstruct. The Supreme Court has not stated that moving buffer zones are never permissible, *see id.,* and subjecting Scott to their disadvantages only in the parking lot would not seriously undermine his opportunity for speech.

Alternatively, the court might approach the parking lot in a similar manner to my suggestion for the sidewalk—that is, by drawing lanes within which Scott must remain—or by excluding him from the parking lot altogether.